Matthew DOWD, et al., Plaintiffs,

v.

**CITY OF LOS ANGELES, Defendant.**

**Case No. CV 09–06731 SS.**

United States District Court,
C.D. California.

Signed May 23, 2014.

Lucas H. Oppenheim, Stephen F. Rohde, Law Offices of Stephen Rohde, Los Angeles, CA, for Plaintiffs.

Laurie Rittenberg, Los Angeles City Attorney's Office, David W. Skinner, Dawn A. McIntosh, Deborah J. Fox, Margaret

W. Rosequist, Meyers Nave Riback Silver and Wilson, Los Angeles, CA, for Defendant.

## ORDER (1) GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS AND (2) GRANTING DEFENDANT'S MOTION FOR COSTS

SUZANNE H. SEGAL, United States Magistrate Judge.

### I.

### INTRODUCTION

On January 30, 2014, trial in this matter was held. The Court previously adjudicated several issues in an Order resolving the parties' cross-motions for summary judgment ("MSJ Order"). After a seven-day jury trial with United States Magistrate Judge Suzanne H. Segal presiding,[1] a duly sworn and instructed jury awarded Plaintiffs Matthew Dowd and David "Zuma Dogg" Saltsburg $2 in nominal damages each and Plaintiffs Peter Demian, Edward La Grossa, Anthony Brown, Nathan Pino, Louie Garcia and Rene Castro $1 in nominal damages each. (Dkt. No. 374). On February 27, 2014, the Court entered Judgment in favor of Plaintiffs in these amounts. (Dkt. No. 386).

On March 10, 2014, Plaintiffs filed a Motion for Attorneys' Fees and Costs pursuant to 42 U.S.C. § 1988 (Dkt. No. 387 & 389). That same day, Defendant filed a Motion for Costs pursuant to Federal Rule of Civil Procedure 68. (Dkt. No. 387). On March 25, 2014, Plaintiffs filed an Opposition to Defendant's Motion for Costs, (Dkt. No. 414), and Defendant filed an Opposition to Plaintiffs' Motion for Attorneys' Fees and Costs. (Dkt. No. 417). On April

---

1. The parties consented to the Magistrate Judge's jurisdiction pursuant to 28 U.S.C. § 636 on January 10, 2014. (Dkt. No. 307).

8, 2014, Plaintiffs filed their Reply in support of their Motion for Attorneys' Fees and Costs, (Dkt. No. 427), and Defendant filed its Reply in support of its Motion for Costs. (Dkt. No. 431).

Having considered the parties' submissions and following the May 5, 2014 hearing on the motions, the Court (1) GRANTS Plaintiffs' Motion for Attorneys' Fees and Costs and awards Plaintiffs $601,902.50 in attorney's fees and $2,835.76 in additional costs, and (2) GRANTS Defendant's Motion for Costs and awards Defendant $13,384.93 in costs.

## II.

## BACKGROUND

### A. *Factual Background*

This 42 U.S.C. § 1983 civil rights case arose out of Defendant City of Los Angeles' attempts, as set forth in Los Angeles Municipal Code ("LAMC") § 42.15, to regulate vending and expressive activity on the Venice Beach Boardwalk (the "Boardwalk"). In 2005, the City suspended the 2004 version of LAMC § 42.15 ("the 2004 Ordinance") in response to the legal challenge raised in *Venice Food Not Bombs v. City of Los Angeles,* No. CV 05–04998 DP (SS) (C.D.Cal.2005), and later adopted an amended version of the ordinance (the "2006 Ordinance") as part of a 2006 settlement agreement. (Dkt. No. 287 at 2). In order to avoid the constitutional infirmities from which the 2004 Ordinance suffered, *see Hunt v. City of Los Angeles,* 601 F.Supp.2d 1158, 1170–72 (C.D.Cal.2009), the City subsequently amended the 2006

Ordinance and replaced it with a new version of § 42.15 (the "2008 Ordinance") on May 19, 2008.[2] (Dkt. No. 287 at 3). To protect tourists, prevent altercations between Boardwalk performers, maintain clear lanes for emergency and public safety vehicles, and limit excessive noise pollution, the 2008 Ordinance provided that "[e]xcept as specifically allowed in this section, no person shall engage in vending" along the Boardwalk. (*Id.* at 2–3 (citing LAMC § 42.15(A))).

First, the 2008 Ordinance divided much of the available space on the Boardwalk into individual spaces designated as P–Zone and I–Zone spaces. LAMC § 42.15(2). In the P–Zone spaces, persons could "perform, engage in traditional expressive speech, and petitioning activities, and vend the following expressive items: newspapers, leaflets, pamphlets, bumper stickers, patches, buttons, or books created by the vendor or recordings of the vendor's own performances...." LAMC § 42.15(2)(a). In the I–Zone spaces, individuals could engage in the full range of permissible P–Zone activities plus "vending of expressive items created by the vendor, or the vending of expressive items that are inextricably intertwined with the vendor's message." LAMC § 42.15(2)(b).

With limited exception, anyone wishing to use a P–Zone or I–Zone space during "Peak Seasons" was required to apply for an annual permit and enter into a lottery system by which spaces were assigned each day. (Dkt. No. 287 at 4 (citing Program Rules at pp. 2–3)). The person who won the space had priority access to the space. However, after 12:00 p.m., anyone

---

**2.** The *Hunt* court struck down as unconstitutionally vague an exception to the vending ban in the 2004 Ordinance for "merchandise constituting, carrying or making a religious, political, philosophical, or ideological message or statement which is inextricably intertwined with merchandise[.]" *Hunt,* 601

F.Supp.2d at 1170–72. The Court did not reach the merits of the plaintiffs' void-for-vagueness challenge to a similar provision in the 2006 Ordinance, finding that the plaintiffs lacked standing to raise the claim. *Id.* at 1175.

(with or without a permit) could use any unoccupied space, provided that she (1) engaged in only P–Zone activities, and (2) relinquished use of the space to the permit-holder if and when the permit-holder returned. (*Id.*). Outside of the P–Zones and I–Zones, anyone could engage in P–Zone activity and sell items "inextricably intertwined" with the vendor's message so long as she did not set up any "display table, easel, stand, equipment, or other furniture, use a pushcart or other vehicle...." LAMC § 42.15(D)(1)(a). On the west side of the Boardwalk, outside of the P- and I–Zones, anyone could engage in any P–Zone activity provided that it was not "vending" and did not "substantially impede or obstruct pedestrian or vehicular traffic, subject to reasonable size and height restrictions on any table, easel, or other furniture...." LAMC § 42.15(D)(1)(b).

Second, the 2008 Ordinance limited performers' noise levels on the Boardwalk. Between 9:00 a.m. and sunset on weekdays, noise levels could not exceed seventy-five decibels when measured at a distance of twenty-five feet away or ninety-six decibels when measured at a distance of one foot away. LAMC § 42.15(F)(1). Furthermore, performers were not permitted to use amplified sound anywhere on the Boardwalk except in specially designated P–Zone spaces between 9:00 a.m. and sunset. (Dkt. No. 287 at 5 (citing Program Rule at p. 4)).

In 2009, Plaintiffs filed this lawsuit raising facial and as-applied challenges to the 2006 and 2008 Ordinances, arguing that they violated the First and Fourteenth Amendments. (*Id.* at 6). Plaintiffs Dowd and Saltsburg also raised facial and as applied challenges to the Los Angeles City Council Rules of Decorum (the "Rules of Decorum"), which were applied against them on numerous occasions when they were ejected and banned from City Council meetings while voicing their concerns over LAMC § 42.15 during public comment sessions. (*Id.* at 7). On August 7, 2013, the Court granted in part and denied in part Plaintiffs' and Defendant's cross-motions for summary judgment, and ordered that this case proceed to trial on the following issues: (1) what damages, if any, did Plaintiffs suffer as a result of the 2008 Ordinance's unconstitutional ban on the use of amplified sound; and (2) what damages, if any, did Plaintiffs Dowd and Saltsburg suffer due to the unconstitutional enforcement of the Rules of Decorum against them on ten separate occasions. (*Id.* at 43–44).

At trial, the jury awarded Plaintiffs Dowd and Saltsburg $2 in nominal damages each and Plaintiffs Peter Demian, Edward La Grossa, Anthony Brown, Nathan Pino, Louie Garcia and Rene Castro $1 in nominal damages each. (Dkt. No. 374). The jury found that the amplified sound ban was "applied" against each Plaintiff in this case. (*Id.* at 3, 7, 11, 15, 19, 23, 27, 31). However, the jury concluded that no Plaintiff "prove[d] by a preponderance of the evidence that he suffered actual injury, such as economic damages, non-economic damages, or both, due to the adoption and application of the 2008 Amplified Sound Ban[.]" (*Id.*). The jury also found that Plaintiffs Dowd and Saltsburg each failed to "prove[ ] by a preponderance of the evidence that he suffered actual injury due to the unconstitutional application of the City Council Rules of Decorum against him[.]" (*Id.* at 5, 9).

**B. *Procedural History***

Plaintiffs filed the instant action on September 16, 2009. (Dkt. No. 1). On October 21, 2010, the Court granted in part Plaintiffs' motion for a preliminary injunction. The Court enjoined the amplified

sound ban as well as the permit and lottery system set forth in LAMC § 42.15.[3] (Dkt. No. 22 at 27). On May 9, 2011, the Court granted Plaintiffs' requests to substitute Stephen F. Rohde, Esq. as their attorney. (Dkt. No. 53). Plaintiffs filed their First Amended Complaint against Defendant on February 9, 2012. (Dkt. No. 76).

Plaintiffs filed a Motion for Summary Judgment, Or In The Alternative, Adjudication Of Issues on August 21, 2012. (Dkt. No. 168–1). First, Plaintiffs argued that the permit and lottery systems in the 2006 and 2008 Ordinances violated the First Amendment because they granted the City unbridled licensing authority. (*Id.* at 17–20). Second, Plaintiffs asserted that the 2006 and 2008 Ordinances constituted unconstitutionally vague, content-based regulations that were not sufficiently tailored to the City's alleged interests. (*Id.* at 21–32). Third, Plaintiffs challenged the amplified sound ban as an unreasonable time, place and manner restriction. (*Id.* at 32–35). Fourth, Plaintiffs argued that the prohibition on setting up or taking down in a designated space after sunset was unconstitutional because it failed to advance any legitimate government interest. (*Id.* at 36). Fifth, Plaintiffs contended that the prohibition on using props over four feet tall in performance spaces constituted an unreasonable prior restraint on street performers who use such props. (*Id.* at 36–37). Sixth, Plaintiffs challenged the rule that groups in large act performances had to rotate every hour because it failed to advance any legitimate government interest. (*Id.* at 37–38). Seventh, Plaintiffs facially attacked the Rules of Decorum as unconstitutionally vague and a presumptively invalid "viewpoint-based" regulation. (*Id.* at 38–40). Seventh, Plaintiffs Dowd

and Saltsburg claimed that the Rules of Decorum were unconstitutionally applied against them when they were ejected and temporarily barred from attending City Council meetings due to their use of profanity and other harsh language while criticizing City Council members during public comment sessions. (*Id.* at 42–45). On September 21, 2012, Defendant filed its Opposition and requested that the Court grant Defendant summary judgment on all claims. (Dkt. No. 208 at 37).

On August 7, 2013, the Court issued the MSJ Order, in which it granted in part and denied in part the parties' cross-motions for summary judgment. (Dkt. No. 287). First, the Court granted summary judgment in favor of Defendant on Plaintiffs' challenges to the 2006 Ordinance on the ground that these claims were time-barred. (*Id.* at 9–10). Second, the Court granted summary judgment in Defendant's favor on the constitutionality of the 2008 Ordinance's permit and lottery system. (*Id.* at 10–22). Third, the Court granted summary judgment in Plaintiffs' favor on their argument that the 2008 Ordinance's ban on the use of amplified sound was facially unconstitutional. (*Id.* at 22–24). Fourth, the Court granted summary judgment in Defendant's favor on the 2008 Ordinance's restriction on equipment height. (*Id.* at 24–7). Fifth, the Court granted summary judgment to Defendant on the constitutionality of the rotation requirement for large act/performance groups. (*Id.* at 27–28). Sixth, the Court granted summary judgment in favor of Defendant on the 2008 Ordinance's restriction on all activity in designated spaces between 9:00 a.m. and sunset. (*Id.* at 29). Seventh, the Court granted summary judgment in favor of Defendant on Plaintiffs' facial challenge to the Rules of Deco-

---

**3.** This case began before District Judge Dean D. Pregerson. The parties consented to the

jurisdiction of Magistrate Judge Suzanne H. Segal on January 10, 2014. (Dkt. No. 307).

rum, but granted summary judgment in Plaintiffs' favor with respect to their as-applied challenge to the application of the Rules against Plaintiffs Dowd and Saltsburg on certain occasions. (*Id.* at 29–43). Eighth, the Court denied summary judgment on the issue of damages. (*Id.* at 43). The case then proceeded to trial and a jury awarded Plaintiffs $10 in nominal damages. (Dkt. No. 374).

Plaintiffs filed their Motion for Attorneys' Fees and Costs on March 10, 2014 seeking $995,042.32 in attorneys' fees and $23,911.83 in costs. (Dkt. No. 388 at 1). That same day, Defendant filed its Motion for Costs seeking $23,389.26 in costs incurred after December 17, 2013, *i.e.*, the date that Defendant made a settlement offer to Plaintiffs pursuant to Federal Rule of Civil Procedure 68. (Dkt. No. 387 at 3). On March 25, 2014, Plaintiffs filed their Opposition to Defendant's Motion for Costs, (Dkt. No. 414), and Defendant filed its Opposition to Plaintiff's Motion for Attorneys' Fees and Costs, which argues that Plaintiffs are entitled to, at most, $124,000 in attorneys' fees. (Dkt. No. 417 at 7). On April 8, 2014, Plaintiffs filed their Reply in support of their Motion for Attorneys' Fees and Costs, (Dkt. No. 427), and Defendant filed its Reply in support of its Motion for Costs. (Dkt. No. 431). On May 5, 2014, the Court held a hearing on the parties' motions.

## III.

## DISCUSSION

### A. *Plaintiffs Are Entitled To Attorney's Fees In This Action Pursuant To 42 U.S.C. § 1988*

 "In the United States, parties are ordinarily required to bear their own attorney's fees—the prevailing party is not entitled to collect from the loser." *Buckhannon Bd. and Care Home, Inc. v. West*

*Virginia Dep't of Health and Human Res.*, 532 U.S. 598, 603, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Pursuant to this "American Rule," prevailing parties are not entitled to attorney's fees "absent explicit statutory authority." *Id.* (internal quotation marks omitted). However, for private civil rights actions brought pursuant to 42 U.S.C. § 1983, "Congress has established an exception to the 'American Rule' that 'the prevailing litigant is ordinarily not entitled to collect [counsel fees] from the loser.'" *Sole v. Wyner*, 551 U.S. 74, 77, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007) (quoting *Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). This exception, which is codified under 42 U.S.C. § 1988, "authorizes federal district courts, in their discretion, to 'allow the prevailing party ... a reasonable attorney's fee as part of the costs.'" *Id.* (quoting 42 U.S.C. § 1988(b)). Plaintiffs filed the instant civil rights action pursuant to § 1983. Despite receiving only nominal damages at trial, the Court finds that Plaintiffs "prevailed" within the meaning of § 1988 and are entitled to reasonable attorney's fees.

### 1. Plaintiffs "Prevailed" And Are Entitled To Fees

 "[I]n order to qualify for attorney's fees under § 1988, a plaintiff must be a 'prevailing party[,]'" and a party "prevails" when "actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 110, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Higher Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 715 (9th Cir.2013) (same). The Supreme Court and Ninth Circuit recognize that "[a] plaintiff who receives a nominal damage award for a § 1983 claim is a prevailing party under § 1988." *Mahach-Wat-*

*kins v. Depee*, 593 F.3d 1054, 1059 (9th Cir.2010); *see also Farrar*, 506 U.S. at 112, 113 S.Ct. 566. However, while a nominal damages award "does not affect the prevailing party inquiry[,]" "it does bear on the propriety of fees awarded under § 1988." *Farrar*, 506 U.S. at 114, 113 S.Ct. 566 (the degree of a plaintiff's success does not affect his *eligibility* for a fee award, but is relevant to whether a party is *entitled* to fees); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (a plaintiff's degree of success is the "most critical factor" bearing on the reasonableness of a fee award). Thus, a party receiving only nominal damages must also achieve "other tangible results—such as sparking a change in policy or establishing a finding of fact with potential collateral estoppel effects"—to support an award of attorney's fees. *Wilcox v. City of Reno*, 42 F.3d 550, 554–55 (9th Cir.1994); *see also Benton v. Oregon Student Assistance Comm'n*, 421 F.3d 901, 906 (9th Cir.2005).

■ To determine whether a plaintiff has succeeded in some additional way justifying an award of attorney's fees under § 1988, a district court must consider three factors: (a) the difference between the amount recovered and the damages sought; (b) the significance of the legal issue on which the plaintiff has prevailed; and (c) whether the plaintiff accomplished some public goal. *See, e.g., Mahach–Watkins*, 593 F.3d at 1059 (citing *Farrar*, 506 U.S. at 121, 113 S.Ct. 566 (O'Connor, J., concurring)); *Cummings v. Connell*, 402 F.3d 936, 947 (9th Cir.2005). Here, these factors favor an award of reasonable attorney's fees to Plaintiffs.

### a. Difference Between Amount Recovered And Amount Sought

■ Plaintiffs recovered significantly less at trial than they requested. Although Plaintiffs sought, in the First Amended Complaint, damages against the City "according to proof at trial," (Dkt. No. 76 at 38), they requested hundreds of thousands of dollars in damages at trial. As discussed above, the jury reached a verdict in Plaintiffs' favor, but awarded Plaintiffs only $10 in nominal damages. The resulting "substantial difference between the judgment recovered and the recovery sought suggests that [Plaintiffs'] victory [wa]s in fact purely technical." *See Farrar*, 506 U.S. at 121, 113 S.Ct. 566 (O'Connor, J., concurring). However, "the difference between the amount recovered and the damages sought is not the only consideration," and "an award of nominal damages can represent a victory in the sense of vindicating rights even though no actual damages are proved." *Id.* While this single factor may weigh against an award of attorney's fees, the Court finds that the other factors set forth in *Farrar* favor awarding Plaintiffs reasonable attorney's fees in this case, as discussed below.

### b. Significance Of The Legal Issues On Which Plaintiffs Prevailed

■ The second factor looks to the significance of the legal issue on which a plaintiff has prevailed, and both the general importance of the legal issue and the extent of a plaintiff's success are relevant at this stage of the inquiry. *See Mahach–Watkins*, 593 F.3d at 1061. Plaintiffs raised a wide range of First Amendment challenges to LAMC § 42.15 and the City Council's Rules of Decorum. Ultimately, Plaintiffs prevailed on their claims that the amplified sound ban was facially unconstitutional and that the Rules of Decorum were unconstitutionally applied to Plaintiffs Dowd and Saltsburg when they had not actually disrupted the City Council meetings at issue.

"Free speech is the 'matrix, the indispensable condition, of nearly every other form of freedom.'" *United States v. Giese,* 597 F.2d 1170, 1208 (9th Cir.1979) (quoting *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). As such, the freedoms encompassed by the First Amendment "'always have been viewed as fundamental components of the liberty safeguarded by the Due Process Clause.'" *Vasquez v. Rackauckas,* 734 F.3d 1025, 1042 (9th Cir.2013) (quoting *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 780, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). Courts afford traditional public fora, such as the Boardwalk,[4] special protective status under the First Amendment. *Seattle Affiliate of Oct. 22nd Coalition to Stop Police Brutality, Repression and Criminalization of a Generation v. City of Seattle,* 550 F.3d 788, 797 (9th Cir.2008). Similarly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps,* 562 U.S. 443, 131 S.Ct. 1207, 1215, 179 L.Ed.2d 172 (2011); *see also Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377, 400, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (Stevens, J., concurring) (protection of political speech lies at the heart of the First Amendment).

Although Plaintiffs did not prevail on all or even most of their claims against the City, their limited success involved legal issues at the core of the First Amendment, namely regulating speech in a traditional public forum and punishing speech that is critical of elected officials. Moreover, the Ninth Circuit has indicated that, in making a fee determination, it is appropriate to consider the importance that sister circuits afford a legal issue, *see Mahach–Watkins,* 593 F.3d at 1061, and courts outside this circuit consistently find First Amendment issues sufficiently important to support an award of attorney's fees. *See, e.g., Zinna v. Congrove,* 680 F.3d 1236, 1240 (10th Cir.2012); *Lippoldt v. Cole,* 468 F.3d 1204, 1223–24 (10th Cir.2006). Accordingly, the legal significance of the First Amendment issues on which Plaintiffs prevailed weighs strongly in favor of a fee award.

### c. Whether Plaintiffs Accomplished Some Public Goal

In *Wilcox,* the Ninth Circuit clarified that after *Farrar,* a plaintiff receiving only nominal damages must achieve "tangible results" beyond nominal damages, such as "sparking a change in policy," to be entitled to attorney's fees under § 1988. *Wilcox,* 42 F.3d at 555. Plaintiffs "spark[ed] a change in policy" to the extent the Court declared the amplified sound ban unconstitutional. Though Defendant repealed and replaced the 2008 Ordinance in its entirety prior to the Court's MSJ Order, (*see* Dkt. No. 417 at 8), the City would have been free to impose a similar sound ban had Plaintiffs not succeeded on their amplified sound ban claim. Because Plaintiffs prevailed, the City is no longer free to revert to the 2008 Ordinance and impose an amplified sound ban that falls uniquely and unfairly on the shoulders of street performers. Plaintiffs' success on this claim will therefore not only inure to the benefit of Plaintiffs and other performers like them, but also to the public at large given the Boardwalk's historical significance as a traditional public forum. *See Wilcox,* 42 F.3d at 556–57 (upholding fee award where the lawsuit achieved the following "admirable results": (1) the jury determined a city policy to be unconstitutional; (2) the jury further determined that the policy caused injury to plaintiff; (3) the lawsuit likely precipitated the change in city policy dur-

---

**4.** *See* LAMC § 42.15(A)(1)(a) (the Boardwalk is "historically significant as a traditional public forum for its performance and visual artists, as well as other free speech activity").

ing the pendency of the litigation; and (4) the judgment would prevent the city from reverting to its old policy or a similar policy).

Beyond the amplified sound ban, Plaintiffs Dowd and Saltsburg also successfully challenged the application of the Rules of Decorum to their use of profanity and other sharp language while criticizing elected officials, which did not "actually disrupt" a City Council meeting. The Ninth Circuit has recognized that a plaintiff receiving nominal damages accomplishes some public goal where his victory makes it less likely that similar constitutional violations will occur in the future. In *Mahach–Watkins*, the Ninth Circuit was "unwilling to conclude that no public goal was served" by the plaintiff's receipt of nominal damages on an excessive force claim despite the California Highway Patrol's refusal to discipline the officer involved or change its policies. *Mahach–Watkins*, 593 F.3d at 1063 (that the CHP did not intend to alter its use of force policy did not mean that plaintiff's lawsuit failed to accomplish a public goal because the jury's verdict would likely (1) deter the officer defendant from engaging in future unconstitutional conduct, and (2) protect others like plaintiff by establishing a deterrent to officials involved in establishing and implementing arrest policies). Similarly, in *Guy v. City of San Diego*, 608 F.3d 582 (9th Cir.2010), the Ninth Circuit rejected the district court's conclusion that the plaintiff's excessive force lawsuit did not give rise to any tangible benefit other than the award of nominal damages. *Id.* at 589–90. Again, despite the lack of evidence that the police department changed its investigation procedures or modified its use of force policies, the *Guy* court concluded that the "jury verdict that some of [the officer defendant's] force was excessive offers clear and important guidance to the police department which is a sufficient-

ly tangible result." *Id.* at 590. Because it was "logical to expect, in the face of th[e] jury verdict, that the police department would take a closer look at the level of force used by its police officers after they have subdued a suspect[,]" the Ninth Circuit found that the plaintiff achieved a result "justify[ing] some amount of costs and attorney fees." *Id.*

Plaintiffs' successful as-applied challenge to the Rules of Decorum achieved a sufficient public goal. In granting summary judgment in Plaintiffs' favor, the Court noted that "it appears from the video evidence that the City Council and the representative of the City attorney do not always require a disruption beyond the breach of the Rules of Decorum. Additionally, they appear to interpret the use of profanity as an actual disruption per se." (Dkt. No. 287 at 38). The Court classified criticizing city council members as political speech "at the heart of the First Amendment," and concluded that using profanity in making these criticisms does not justify the removal or barring of an individual from city council meetings. (*See id.* at 39–40).

Based on this ruling, the City will likely reevaluate the way it conducts City Council meetings, thus making it less likely that individuals partaking in public comment sessions will be punished for engaging in protected political speech. Indeed, the Court noted that the City "would do well to consider revising the Rules of Decorum to make it clear that an actual disruption is required before a speaker can be ejected" because such a revision "would provide clear guidance to the City Council to help it conduct its business within the bounds of the First Amendment." (Dkt. No. 287 at 33 n. 8). There is little doubt that the Court's MSJ Order will serve as a guidepost for the City as it attempts to enforce or revise its Rules of Decorum to avoid

treading on the public's First Amendment rights. Moreover, Plaintiffs' success in this litigation will likely deter councilmembers' understandable impulse to eject or suspend speakers who subject them to offensive but constitutionally permissible criticism.

■ In sum, this litigation produced tangible results beyond nominal damages that weigh in favor of a fee award in this case. Because of the significance of the legal issues on which Plaintiffs prevailed and the public benefit that this litigation achieved, the Court finds that Plaintiffs are prevailing parties entitled to attorney's fees.[5]

**B. *Plaintiffs Are Barred From Recovering Costs Or Attorney's Fees Incurred After December 17, 2013, Due To Their Rejection Of Defendant's Rule 68 Offer Of Judgment***

**1. Rule 68**

Federal Rule of Civil Procedure 68(a) provides that "[a]t least fourteen days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued." The opposing party then has fourteen days to accept the offer of judgment before the offer lapses and is deemed withdrawn. *See* Fed.R.Civ.P. 68(a), (b). If the opposing party does not accept the offer and "the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." Fed.R.Civ.P. 68(d).

■ The "plain purpose" of Rule 68 and its cost-shifting provision "is to encourage settlement and avoid litigation." *Marek v. Chesny*, 473 U.S. 1, 5, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) ("The Rule prompts both parties to a suit to evaluate the risks and costs of litigation, and to balance them against the likelihood of success upon trial on the merits."). The "critical feature" of Rule 68's fee-shifting provision is "that the offer be one that *allows judgment to be taken against the defendant for both the damages caused by the challenged conduct and the costs then ac-*

---

**5.** Prevailing civil rights plaintiffs "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley*, 461 U.S. at 429, 103 S.Ct. 1933. Cases-satisfying the "special circumstances" standard are uncommon, "such as when there is 'both a strong likelihood of success on the merits and a strong likelihood of a substantial judgment at the outset of litigation.'" *Am. Broad. Cos., Inc. v. Miller*, 550 F.3d 786, 788 (9th Cir.2008). First, here, there was not a strong likelihood that Plaintiffs would succeed on the merits. The Court granted Plaintiffs a preliminary injunction only as to the amplified sound ban and permit and lottery system. (Dkt. No. 287 at 7). Moreover, that the Court ultimately granted summary judgment in favor of Defendant on the permitting and lottery system and Rules of Decorum suggests that Plaintiffs' chance of success was not as high as initially believed. Second, Plaintiffs did not enjoy a high likelihood of a substantial judgment. Plaintiffs struggled to provide compelling evidence of their alleged injuries. Each Plaintiff testified at trial regarding his earnings on the Boardwalk, but this testimony was generally unsupported by tax returns or other records. Similarly, Plaintiffs offered no evidence other than their own testimony regarding their non-economic injuries. These evidentiary challenges and the jury's decision to award solely nominal damages indicate the absence of a high likelihood of a substantial judgment when this litigation commenced. Finally, allowing attorney's fees here furthers the purposes of § 1988—but for the possibility of obtaining attorney's fees, it is unlikely that Plaintiffs could have obtained competent counsel in this high-risk, low-reward civil rights action. *See City of Riverside v. Rivera*, 477 U.S. 561, 576, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (through § 1988, Congress intended to attract competent counsel for "victims [who] ordinarily cannot afford to purchase legal services at the rates set by the private market.").

*crued.*" *Marek,* 473 U.S. at 6, 105 S.Ct. 3012 (emphasis in original). The Supreme Court has noted that the drafters of Rule 68 were not concerned "so much with the particular components of offers, but with the *judgments* to be allowed against defendants." *Id.* (offer that lumped defendant's proposal for damages with their proposal for costs was valid because "it is immaterial whether the offer recites that costs are included, whether it specifies the amount the defendant is allowing for costs, or, for that matter, whether it refers to costs at all. As long as the offer does not implicitly or explicitly provide that the judgment *not* include costs, a timely offer will be valid"). The Ninth Circuit has therefore recognized that "[t]he requirements for a valid Rule 68 offer are simple." *Herrington v. Cnty. of Sonoma,* 12 F.3d 901, 907 (9th Cir.1993). A Rule 68 offer of judgment must (1) specify a definite sum for which judgment may be entered, (2) be unconditional, and (3) include costs then accrued. *See id.*

■ To determine whether an offer of judgment meets Rule 68's requirements, a court will apply "the usual rules of [contract] construction." *Id.* (citing *Erdman v. Cochise Cnty., Arizona,* 926 F.2d 877, 880 (9th Cir.1991)). "[A]mbiguities will be construed against the offeror as the drafting party and, where such ambiguities are found to exist, extrinsic evidence of the parties' actual intentions will be examined to clarify those ambiguities and arrive at the meaning of the offer's material terms." *Id.*

### 2. Defendant's Rule 68 Offer Of Judgment Was Valid

Defendant served Plaintiffs with a Rule 68 offer of judgment on December 17, 2013 (the "Offer"). *(See* Dkt. No. 387–2 at 2–4). The Offer, which Plaintiffs did not accept, provided as follows:

[D]efendant City of Los Angeles ('the City') hereby offers to allow judgment to be taken against it and in favor of plaintiffs as follows:

1. In the amount of $10,100 to plaintiff Matthew Dowd;

2. In the amount of $10,100 to plaintiff David Saltsburg;

3. In the amount of $5,100 to plaintiff Peter Demian;

4. In the amount of $5,100 to plaintiff Edward La Grossa;

5. In the amount of $5,100 to plaintiff Anthony Brown;

6. In the amount of $5,100 to plaintiff Nathan Pino;

7. In the amount of $5,100 to plaintiff Louie Garcia;

8. In the amount of $5,100 to plaintiff Rene Castro; and

9. Costs incurred prior to the date of this offer by plaintiffs which shall include attorneys' fees in an amount to be determined by the Court.

Acceptance by less than all plaintiffs shall be deemed a rejection of this offer. This Rule 68 offer does not constitute an admission of liability by or on behalf of the City, and the City expressly denies liability for any amount. (*Id.* at 3).

On March 10, 2014, Defendant filed a motion to recover $26,389.26 in costs that it incurred after December 17, 2013, *i.e.,* the date it served the Offer on Plaintiffs. Defendant also contends that because Plaintiffs recovered only $10 in nominal damages at trial, as compared to the more favorable $50,800 they were offered, they are barred from recovering any costs, including attorney's fees, that they incurred after Defendant made its Rule 68 offer of judgment. (*See* Dkt. No. 417 at 11–17, 29).

Plaintiffs argue that, as a threshold matter, the Offer was defective and therefore

cannot bar Plaintiffs recovery of costs, including attorney's fees, post-dating December 17, 2013. Plaintiffs argue that the Offer was defective for three reasons: (1) the Offer was contingent on acceptance by "all plaintiffs" but did not offer money to all plaintiffs and was not served on all plaintiffs; (2) the Offer was unreasonable and abusive because it required acceptance by "all plaintiffs" despite failing to offer Willie Lee Turner or Jesse Brown any monetary incentive to accept; and (3) the Offer failed to comply with Rule 68's procedural requirements because it did not set forth a period within which to respond and did not remain open for the requisite fourteen-day period. (*See* Dkt. No. 414 at 2–6; *see* also Dkt. No. 389 at 25–30). For the reasons discussed below, the Court disagrees and finds that Defendant's Rule 68 offer of judgment was valid.

### a. Failure To Include Jesse Brown And Willie Lee Turner In The Offer

Plaintiffs argue that the Offer was "facially incapable of acceptance" because it provided that "acceptance by less than all plaintiffs shall be deemed a rejection[,]" but included no offer of money or judgment to Jesse Brown or Willie Lee Turner, nor was the offer served directly on these plaintiffs. (Dkt. No. 389 at 27; *see also* Dkt. No. 414 at 3–4). Plaintiffs claim that "[a]t the time of the Offer there were not *eight* Plaintiffs, there were *ten*, including [Jesse Brown] whom neither the Court nor any party could notify of the Offer." (Dkt. No. 414 at 3). Thus, "the City made it impossible for the Plaintiffs against whom it seeks to invoke the Offer to effectively accept the Offer[ ]" because acceptance by the eight Plaintiffs named in the Offer would have constituted a rejection thereof absent the agreement of Mr. Brown and Mr. Turner. (*Id.* at 4). The Court disagrees with Plaintiffs' contentions.

As to Mr. Brown, Mr. Rohde and his law firm moved to withdraw as counsel for Mr. Brown on August 16, 2012 on the ground that "despite written requests for cooperation on March 26, March 27, March 28, April 4, April 9, April 18, April 29, May 10, June 30 and August 9, 2012," Mr. Brown's failure to respond "rendered it unreasonably difficult" for Mr. Rohde and his associates to effectively represent him. (Dkt. Nos. 132 & 132–1 at 2–3). The Court granted Mr. Rohde's request to withdraw on September 25, 2012 and noted that there was no current address information for Mr. Brown and that, according to Mr. Rohde, no one had heard from Mr. Brown in several months. (Dkt. No 234 at 2). On November 5, 2013, Defendant moved to dismiss Mr. Brown as a plaintiff in this action, (Dkt. No. 288), and Plaintiffs did not oppose this motion. (*See* Dkt. No. 289 at 2). On December 5, 2013, the Court vacated the December 9, 2013 hearing date on Defendant's motion to dismiss Mr. Brown and notified counsel that the matter would be decided without oral argument. (Dkt. No. 290). Twenty-one days after Defendant filed its Rule 68 Offer, on January 7, 2014, the Court dismissed Mr. Brown from this action. (Dkt. No. 303). The Court noted that Mr. Brown "has not provided the Court or Defendant with a valid, current address. He has also failed to appear for his deposition on two occasions. Mr. Brown has not been represented by counsel in this action since September 25, 2012 when the court granted an application by his former counsel … to withdraw." (*Id.* at 1–2). These facts justify Defendant's decision not to offer money to Mr. Brown, who apparently had lost interest in this litigation. Indeed, in light of the foregoing, the Court finds that Mr. Brown was not truly a "plaintiff" in any meaningful sense of the word when Defendant served its Rule 68 offer on December 17, 2013.

Plaintiffs argue that they could not have reasonably believed that acceptance of the Offer was possible absent Mr. Brown's agreement. (Dkt. No. 414 at 4). The Court disagrees. Given the background described above, it was unreasonable for Plaintiffs to believe that Defendant, in an "attempt to abuse Rule 68," (*id.*), intended to preclude acceptance by requiring acceptance of "all plaintiffs" while neglecting to serve Mr. Brown, who had not participated in this litigation in over a year and for whom no valid contact information existed. Plaintiffs urge the Court to see Defendant's bad faith at every turn, but provide no credible support for the suggestion that Defendant structured the Offer in a way so as to render acceptance impossible. Indeed, the Court agrees with Defendant that had it included Mr. Brown in the Offer and attempted to serve him, it is likely that Plaintiffs would be accusing the City of abusing Rule 68 by requiring acceptance of an in-name-only and unreachable plaintiff. (Dkt. No. 431 at 7). Thus, Mr. Brown's approval was not a predicate to the Offer's acceptance, and it was unreasonable for Plaintiffs to believe that acceptance was impossible absent Mr. Brown's assent.

■ With respect to Mr. Turner, the Court finds that the Offer required acceptance by Mr. Turner to the extent it provided that "[a]cceptance by less than all plaintiffs shall be deemed a rejection of this offer." Mr. Turner, prior to the Rule 68 Offer, had entered into a unique stipulation with Defendant concerning only his claims. On December 13, 2013, the parties stipulated that Mr. Turner "ha[d] no remaining claims to be heard at trial . . ., provided that [Mr.] Turner reserve[d] this right to appeal any and all prior judgments by this Court." (Dkt. No. 291 at 2). On December 17, 2014, the Court granted the parties' stipulation. (Dkt. No. 292).

Even though Mr. Turner stipulated that he "had no remaining claims to be heard at trial," Mr. Turner was nevertheless a party to this action when Defendant made its Rule 68 offer. The Court has reviewed the stipulation, and, based on its plain language, there is no reason to conclude that the parties or the Court intended to dismiss Mr. Turner from the case. *See United States v. Petty,* 80 F.3d 1384, 1387 (9th Cir.1996) ("Like any other contract, we must interpret [a stipulation] so as to carry out the intention of the parties."); *Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of a contract should be considered first."). Rather, the stipulation provided only that Mr. Turner had no *remaining* claims to pursue at trial, but reserved his right to appeal the Court's judgments, including the Court's summary judgment ruling that resolved certain claims against Turner.

Second, the Defendant's Rule 68 offer's failure to mention Mr. Turner by name did not render the Offer ambiguous. Defendant's offer of judgment clearly set forth the dollar amounts that the City was willing to pay to settle this matter. (*See* Dkt. No. 387–2 at 3). Defendant's omission of Mr. Turner is therefore unambiguous: Defendant offered Mr. Turner $0 to settle his remaining claims against the City. The offer contained other incentives for Turner to settle, however, as discussed below. Given the parties' stipulation that Mr. Turner had no remaining claims, *i.e.,* no damages, to pursue at trial, Defendant's unwillingness to offer Mr. Turner a specific amount for his claims is logical.

■ It is "manifestly unjust" to allow a party to argue "after the fact that [a Rule 68] offer really means more than it says[,]" *Erdman,* 926 F.2d at 880 (internal quotations omitted), and courts may not "inject

ambiguity" into a Rule 68 offer by "listing those things it does not promise[.]" *Herrington*, 12 F.3d at 907. Although Mr. Turner was not named in the Offer, Defendant expressly offered to allow judgment to be taken in favor of "plaintiffs" provided that "'all plaintiffs" accepted the Offer. (Dkt. No. 387–2 at 3). Plaintiffs have not provided any persuasive reason to conclude that Mr. Turner did not qualify as a "plaintiff" at the time the Offer was made. To the contrary, Plaintiffs admit that Mr. Turner was a plaintiff when Defendant made its offer of judgment. (*See* Dkt. No. 414 at 3 ("At the time of the Offer, there were not *eight* Plaintiffs, there were *ten*.")). Therefore, Mr. Turner's acceptance was required and Plaintiffs had no reasonable basis to conclude otherwise.[6]

Third, that the proof of service attached to the Offer did not name Mr. Turner is immaterial given that the Offer was served on Mr. Rohde, who represented Mr. Turner, (Dkt. No. 389 at 22), as well as the other Plaintiffs in this litigation. (Dkt. No. 387–2 at 4). Federal Rule of Civil Procedure 5(b) provides that if a party is represented by an attorney, "service under this rule must be made on the attorney unless the court orders service on the party." Service was made on Mr. Turner's attorney, Mr. Rohde, and it was therefore effective.

### b. Requirement That All Plaintiffs Accept

Plaintiffs also challenge the Offer on the ground that it unreasonably and abusively required the acceptance of "all plaintiffs," but did not provide Mr. Brown and Mr. Turner any monetary incentive to tender their acceptance. (Dkt. No. 414 at 5).

Plaintiffs appear to argue that Defendant sought to create disagreement among Plaintiffs by offering some of them money to settle while offering others (namely, Mr. Brown and Mr. Turner) nothing, thereby rendering uniform acceptance unlikely.

To begin, the Ninth Circuit has expressly approved of Rule 68 offers that require the acceptance of multiple plaintiffs. *See Lang v. Gates*, 36 F.3d 73, 75 (9th Cir. 1994). Although Plaintiffs argue that "[v]arious courts have expressed concern over the tactical abuse of offers under Rule 68 which contain 'acceptance by all' conditions[,]" the Ninth Circuit has not. Furthermore, Plaintiffs have not provided any evidence that the Offer was merely a "sham" designed to afford Defendant the benefits of a Rule 68 offer, but preclude acceptance. Defendant had little to gain by proceeding to trial after the Court's MSJ Order, and Defendant's offer, which significantly exceeded the amount of money that Plaintiffs received at trial, was reasonable.

As the Court has already discussed, Mr. Brown was not an active participant in this litigation at the time Defendant made its Rule 68 offer of judgment. Instead, he was on the cusp of being dismissed from this action without protest from Plaintiffs' attorney, Mr. Rohde, who withdrew as Mr. Brown's counsel over a year earlier. Defendant had no reason to offer Mr. Brown money to settle claims that he had no intention of pursuing. Thus, it was reasonable and proper to omit Mr. Brown from the Offer altogether.

With respect to Mr. Turner, the Court granted the parties' stipulation on December 17, 2014 that Mr. Turner did not have

---

**6.** That Mr. Rohde did not inquire about the necessity of Mr. Turner's acceptance after he received the Offer confirms the lack of ambiguity concerning the Offer's terms. *See Herrington*, 12 F.3d at 907 (to resolve any ambiguities in a Rule 68 offer, a court may examine extrinsic evidence of the parties' actual intent to arrive at the meaning of the offer's material terms).

any claims to pursue at trial, but reserved his right to appeal the Court's earlier rulings. (Dkt. No. 292). Plaintiffs argue that despite the parties' stipulation, the Offer was abusive because it gave Mr. Turner "no incentive to accept whatsoever." (Dkt. No. 414 at 5). The Court disagrees.[7]

First, had Plaintiffs, including Mr. Turner, accepted the Offer, Mr. Turner would have been able to immediately pursue any appeal that he intended to make. Thus, Mr. Turner had the incentive of accepting the offer to expedite a possible reversal of the adverse summary judgment rulings that pertained to him. The offer of judgment would have no impact on Mr. Turner's right to appeal, which he preserved through a separate stipulation. Second, Defendant offered Plaintiffs, including Mr. Turner, their then-accrued costs, which included attorney's fees. Third, by accepting Defendant's Rule 68 offer of judgment, Plaintiffs, including Mr. Turner, could have insulated themselves from any requirement that they pay Defendant's costs in this litigation. Thus, Mr. Turner, like each Plaintiff in this action, had ample incentive to accept Defendant's Rule 68 offer of judgment.[8]

Plaintiffs also claim that the Offer was unreasonable as to Mr. Turner because it was "hopelessly ambiguous[,]" failing to specify the Offer's effect on (1) Turner's right to appeal, (2) "whether judgment against the City would be entered in Turner's favor if the offer was accepted[,]" or (3) "what claims it would be entered in light of the Court's [MSJ] Order." (Dkt. No. 389 at 29–30). However, by its plain language, the Offer imposed no express or implied limitation on Mr. Turner's (or any other Plaintiff's) right to appeal the Court's judgments. Plaintiffs cannot invalidate the Offer by reference to limitations that, according to the Offer's plain language, simply do not exist.

The Ninth Circuit has made clear that a court cannot read ambiguity into an otherwise clear Rule 68 offer by "listing those things it does not promise[.]" *Herrington,* 12 F.3d at 907. In *Herrington,* the Ninth Circuit expressly rejected an attempt to invalidate a Rule 68 offer on the ground that it omitted any reference to a party's right to appeal. *See id.* ("The offer is clear on its face, and we reject the [plaintiffs'] efforts to inject ambiguity into the settlement offer by listing those things that it does not promise, e.g., that the [defendant] will not proceed with any other appeals. . . ."). Here, contrary to *Herrington,* Plaintiffs ask the Court to invalidate the Offer because of what it fails to

---

7. On May 2, 2014, the Court provided the parties a tentative version of this Order ("Tentative"). In the Tentative, the Court explained that "because Mr. Turner had no claims to present at trial, he had no incentive to accept or decline the Offer, especially considering that it did not affect his right to appeal the Court's judgments in this case." Having heard the parties' arguments on May 5, 2014, and reexamined the record, the Court has reconsidered the above-quoted conclusion. The Court finds that Mr. Turner was adequately incentivized to accept Defendant's Rule 68 offer, as explained above.

8. During the May 5, 2014 hearing, Plaintiffs argued that the Offer was invalid because it lacked adequate consideration. Although courts apply traditional principles of contract construction in determining whether a Rule 68 offer is proper, *see Lang,* 36 F.3d at 75, Plaintiffs have not cited any authority for the proposition that Rule 68 offers are invalid absent "consideration" as the term is generally used in contract law. However, even if Plaintiffs are correct that Rule 68 offers must be supported by valid consideration, the Court finds that had Mr. Turner accepted the Offer, his acceptance would have been bargained for in exchange for the above-described benefits. *See* Restatement (Second) of Contracts § 71(1) ("To constitute consideration, a performance or a return promise must be bargained for.").

mention, *i.e.*, Plaintiffs' appellate rights. Because the Court may not create ambiguity where none exists by seizing on an offer's non-existent terms, Plaintiffs' argument must fail.

Plaintiffs also argue that *Blair v. Shanahan ("Blair I")*, 795 F.Supp. 309, 313–17 (N.D.Cal.1992), which Defendant cites in support of the Offer's validity, (*see* Dkt. No. 417 at 17), actually renders the Offer defective. In *Blair I*, the district court rejected a defendant's attempt to vacate or modify an accepted Rule 68 offer that was silent on each party's appellate rights. *See* 795 F.Supp. at 313–17. The *Blair I* court explained that because neither the Rule 68 offer nor the plaintiff's acceptance of the offer mentioned the right to appeal, there was no "uncertainty as to the terms of the agreement[.]" *Id.* at 314 ("[O]bjectively read, the Rule 68 [wa]s silent as to appeal rights" and "there was no misunderstanding as to any material term of the Rule 68 offer"). *Id.* Thus, "[i]n the contract that was offered and accepted, there was a meeting of the minds as to every material term." *Id.* Relatedly, the court rejected the argument that the judgment was invalid due to mutual mistake. *See id.* at 315–16. The court explained that a mistake regarding "appeal rights in the offer" was impossible because appeal rights were not part of *"the terms* of the agreement itself[.]" *See id.* On appeal, the Ninth Circuit found that the plaintiff's right to appeal did not survive his acceptance of the Rule 68 offer, but nevertheless upheld the district court's decision not to vacate or modify the consent judgment in *Blair I. Blair v. Shanahan ("Blair II")*, 38 F.3d 1514, 1518 (9th Cir.1994) ("The simple fact is . . . that the right to appeal was not a term of the agreement. . . . The consent judgment stands.").

Plaintiffs argue that because the *Blair* plaintiff's right to appeal did not survive his acceptance of a Rule 68 offer, there is no "per se" rule that a plaintiff's right to appeal is preserved when a Rule 68 offer is silent regarding appellate rights. According to Plaintiffs, the lack of a "per se" rule renders the Offer in this case fatally ambiguous because Plaintiffs had no way of knowing or predicting the Offer's effect on Mr. Turner's (or any other Plaintiff's) right to appeal the Court's judgments. However, Plaintiffs misunderstand the meaning of *Blair II*. Notwithstanding its holding that the plaintiff's right to appeal did not survive his acceptance, the Ninth Circuit upheld the lower court's refusal to vacate or modify the consent judgment due to misunderstanding, mistake, or ambiguity. *See id.* at 1518. In doing so, the Ninth Circuit echoed the district court's reasoning that uncertainty regarding terms absent from an offer of judgment is not a proper basis for invalidating a Rule 68 offer. *See id.; see also Blair I*, 795 F.Supp. at 313–16.

The clear takeaway from *Blair I* and *Blair II* is that where a Rule 68 offer is silent regarding the right to appeal, the offer's actual impact on a party's appellate rights is a question distinct from and irrelevant to the validity of the offer of judgment. Furthermore, in *Blair II*, the Ninth Circuit concluded that the plaintiff's right to appeal did not survive because the defendant's offer of judgment expressly provided that the plaintiff's claims would be "dismissed with prejudice" upon acceptance. *See Blair II*, 38 F.3d at 1521. Here, the parties previously stipulated that Mr. Turner retained his right to appeal the Court's judgments, and the Offer did *not* require the dismissal of Mr. Turner's claims with prejudice. Accordingly, it was unreasonable for Plaintiffs to believe, based on *Blair II*, that Mr. Turner's right to appeal would not survive his acceptance of the Offer.

For the foregoing reasons, Defendant's Rule 68 Offer was neither abusive nor fatally ambiguous as to Mr. Turner. However, even if one found the Offer ambiguous, there is strong extrinsic evidence that Plaintiffs and Defendant understood that Mr. Turner's right to appeal would survive his acceptance of the Offer. *See Herrington,* 12 F.3d at 907 (court may look to extrinsic evidence to determine parties' intent). A mere four days prior to Defendant's offer of judgment, the parties stipulated that Mr. Turner retained the right to appeal the Court's judgments. (Dkt. No. 291). Neither party raised any concerns regarding Mr. Turner's right to appeal after Plaintiffs received the offer of judgment, a very short time after the parties stipulated to preserve Turner's right to appeal. This stipulation is strongly probative of the parties' mutual intent that Mr. Turner's appellate rights be preserved. Once the Court granted the parties' stipulation, Mr. Turner's right to appeal was protected by a court order. It is doubtful that Plaintiffs or Defendant interpreted the Offer, which was altogether silent on the issue of appellate rights, as stripping Mr. Turner of the very right to appeal that the Court, pursuant to the parties' stipulation, had just preserved. This extrinsic evidence indicates that contrary to Plaintiffs' suggestion, the parties understood that Defendant's Offer had no impact on Mr. Turner's (or any other Plaintiff's) right to appeal the Court's judgments.[9]

### c. Compliance With Rule 68's Procedural Requirements

Plaintiffs argue that because Defendant failed to "vigorously adhere" to Rule 68's procedural requirements, the Offer is invalid.[10] (Dkt. No. 414 at 5). First, Plaintiffs argue that the Offer is invalid because "it sets forth no period within which to respond." (*Id.*). However, Rule 68(a) provides that "[i]f, within 14 days after being served, the opposing party serves written notice accepting the offer, either party may then file the offer and notice of acceptance, plus proof of service. The clerk must then enter judgment." Rule 68(b) also explains that an "unaccepted offer is considered withdrawn, but it does not preclude a later offer." Reading these provisions together, Rule 68 clearly provides a party fourteen days to accept a Rule 68 offer of judgment before the offer lapses and is deemed withdrawn. *See Whitehouse v. Target Corp.,* 279 F.R.D. 285, 289–90 (D.N.J.2012) ("[U]nless an Offer of Judgment is accepted in accordance with Rule 68(a) within 14 days after service upon the opposing party, the offer will be deemed withdrawn with the resulting consequences specified in Rule 68(d)."). Thus, Rule 68 clearly provides the time-

---

9. Moreover, had Plaintiffs wanted to accept the Offer, but were reluctant to do so because of its alleged ambiguity, it is highly likely that Plaintiffs' counsel would have attempted to clarify the Offer's meaning with Defendant's attorneys. Instead, Plaintiffs let the Offer lapse without seeking additional clarification, which indicates that the desire to proceed to trial (or obtain a better settlement), and not ambiguous terminology, motivated Plaintiffs' decision not to accept the Offer. Indeed, Plaintiffs suggest that their non-acceptance was in fact a result of certain Plaintiffs' dissatisfaction with the City's Offer. (*See* Dkt. No. 389 at 27).

10. Plaintiffs have not provided any support for the rule that "vigorous adherence" to Rule 68's procedural requirements is required. In *Marek,* the Supreme Court suggested just the opposite, explaining that the "critical feature" of a Rule 68 offer is that it allows judgment to be taken against the defendant for both the damages caused by the challenged conduct and the costs accrued. *Marek,* 473 U.S. at 6, 105 S.Ct. 3012. Thus, in analyzing the validity of a Rule 68 offer, the focus should not be the "particular components of offers, but the *judgments* to be allowed against defendants." *Id.*

frame for acceptance, and Plaintiffs have not cited any authority requiring a defendant to recite Rule 68's fourteen-day deadline to render an offer of judgment valid.

Second, Plaintiffs argue that the Offer violated Rule 68's "14–day requirement because its terms prevented the City from holding it open throughout the statutory period." (Dkt. No. 414 at 6). Plaintiffs claim that because the Offer required acceptance by "all plaintiffs[,]" the Offer immediately terminated when, prior to fourteen days after its service, one of the Plaintiffs expressed to Mr. Rohde that he did not want to accept the Offer. (*Id.*). However, this choice by a single Plaintiff cannot be used against Defendants to invalidate the Offer. To the extent Plaintiffs complain that the Offer terminated upon its rejection by one Plaintiff, (*see* Dkt. No. 414 at 6), they take issue with the usual rules of contract law that govern Rule 68 offers. *See, e.g., Collins v. Thompson,* 679 F.2d 168, 171 (9th Cir.1982) ("Generally, rejection or counteroffer terminates the power to accept the previously-made offer."); Restatement (Second) of Contracts § 38(1) (1981) ("An offeree's power of acceptance is terminated by his rejection of the offer, unless the offeror has manifested a contrary intention.").

Moreover, assuming that a Plaintiff in this case told Mr. Rohde to reject the Offer during the fourteen-day period when the Offer was pending, the Court is not persuaded that this constituted a true rejection of the Offer. A rule that a plaintiff rejects and consequently terminates a defendant's settlement offer any time he expresses to his attorney or co-plaintiffs, in private, that he does not want to accept the offer, is not only practically unenforceable, it would also render settlement unreasonably difficult. In this action, Plaintiffs do not allege that any Plaintiff caused Mr. Rohde to formally tender his rejection

to the City within fourteen days of the Offer's service on Plaintiffs, and the Court will not use the confidential communications between Mr. Rohde and his clients to determine when the Offer was rejected.

In sum, Plaintiffs have not offered any convincing reason to doubt the validity of the Offer, and the Court finds that Defendant's Rule 68 offer of judgment was valid. The Offer satisfied Rule 68's requirements. Moreover, it manifested Defendant's willingness to enter into an agreement with Plaintiffs, in turn justifying Plaintiffs' understanding that their assent to that bargain was invited and would conclude it. *See Sateriale v. R.J. Reynolds Tobacco Co.,* 697 F.3d 777, 784 (9th Cir.2012) (listing requirements of a valid contract offer).

### 3. Plaintiffs May Not Recover Any Attorney's Fees Or Costs Incurred After December 17, 2013

"Rule 68 provides that if a timely pretrial offer of settlement is not accepted and 'the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay *the costs incurred after making the offer.*'" *Marek,* 473 U.S. at 5, 105 S.Ct. 3012 (emphasis in original). Thus, Rule 68 encourages settlement by "forcing a plaintiff to weigh the risk of incurring post-offer costs and fees he may not be able to recover even if successful on his claims." *Herrington,* 12 F.3d at 907. The term "costs" in Rule 68 "was intended to refer to all costs properly awardable under the relevant substantive statute or other authority. In other words, all costs properly awardable in an action are to be considered within the scope of Rule 68 'costs.'" *Marek,* 473 U.S. at 9, 105 S.Ct. 3012. "Since Congress expressly included attorney's fees as 'costs' available to a plaintiff in a § 1983 suit, such fees are subject to the cost-shifting provision of Rule 68." *Id.* at 9–11, 105

S.Ct. 3012 (holding that plaintiffs were not entitled to $139,692 in post-offer legal fees where they recovered $8,000 less than defendant's Rule 68 offer and noting that this result was "consistent with the policies and objectives of § 1988 ... [to] encourage[ ] plaintiffs to bring meritorious civil rights suits[ ]"); *see also Family PAC v. Ferguson,* 745 F.3d 1261, 1264–65 (9th Cir.2014) (discussing *Marek* ); *Herrington,* 12 F.3d at 907 ("Because attorney's fees are included as costs of a federal civil rights action under 42 U.S.C. § 1988, the cost-shifting provision of Rule 68 applies to limit a prevailing plaintiff's recovery of fees in a section 1983 action if the plaintiff rejects an offer that exceeds his damages award.").

 The Court notes that a plaintiff who rejects a more favorable Rule 68 offer is not entitled to attorney's fees for post-offer time spent preparing a fee application or otherwise litigating the attorney's fees issue. Typically, "time spent in establishing entitlement to an amount of fees awardable under section 1988 is compensable." *Clark v. City of Los Angeles,* 803 F.2d 987, 992 (9th Cir.1986). However, Supreme Court and Ninth Circuit precedent compel the conclusion that a plaintiff cannot recover *any* post-offer attorney's fees if he accepts an unambiguous offer of judgment or rejects a more favorable Rule 68 offer.

In *Holland v. Roeser,* 37 F.3d 501 (9th Cir.1994), the Ninth Circuit considered whether a § 1983 plaintiff who accepts a Rule 68 offer may recover attorney's fees for preparing a post-offer fee petition. *Id.* at 503. Before resolving this question, the Ninth Circuit noted that in *Marek,* the Supreme Court held only "that a plaintiff in a § 1983 action who rejects a Rule 68 offer and ultimately recovers less than the offered amount is not entitled to recover post-offer costs or fees." *Id.*

Although the *Holland* court then granted the plaintiffs post-offer fees, including fees incurred preparing a fee petition, the Ninth Circuit did so only on the narrow ground that the particular Rule 68 offer that the plaintiffs accepted—which offered the plaintiffs a "sum of ... $500 plus costs now accrued and reasonable attorney fees as determined by the Court"—contained specific language not found in Rule 68 that was "broader than the cost provision [in Rule 68] and might extend to those fees not already accrued." *Id.* at 502, 504. Construing this language against the defendant, the Ninth Circuit upheld the district court's award of post-offer fees. *Id.* at 504. However, the court noted that "an offer of judgment limiting itself to the language of Rule 68 and referring only to 'costs now accrued' " would have barred the plaintiffs' recovery of all post-offer attorney's fees. *Id.* at 504, 504 n. 1.

In *Guerrero v. Cummings,* the Ninth Circuit confirmed that where a plaintiff accepts an offer of judgment that clearly limits a plaintiff to costs incurred prior to the offer, recovery of any post-offer attorney's fees is not permitted. *Guerrero v. Cummings,* 70 F.3d 1111 (9th Cir.1995). The Rule 68 offer in *Guerrero* closely paralleled the Offer in this case, offering the plaintiffs a sum of money "plus reasonable attorney fees and costs incurred ... prior to the date of this offer in an amount to be set by the court." *Id.* at 1112–13. In denying the plaintiffs post-offer fees, the Ninth Circuit explained that the phrase "incurred prior to this date" modified "reasonable attorney fees and costs[,]" thereby strictly limiting fees and costs to those incurred prior to the date of the offer. *Id.* at 1113. While the plaintiffs argued that disallowing post-offer fees undermined § 1988's purpose, the Ninth Circuit cited *Marek* for the proposition that subjecting civil rights plaintiffs to Rule 68's settle-

ment provisions does not curtail their access to the courts or deter them from bringing suit, but simply requires plaintiffs to " 'think very hard about whether continued litigation is worthwhile.' " *Id.* at 1114 (quoting *Marek,* 473 U.S. at 11, 105 S.Ct. 3012).

■■■ In the current action, Defendant offered Plaintiffs a sum of money plus "costs incurred prior to the date of this offer by plaintiffs which shall include attorneys' fees in an amount to be determined by the Court." Thus, the Offer unambiguously limited Plaintiffs to costs, including attorney's fees, incurred prior to the Offer. There is no doubt that had Plaintiffs accepted the Offer, they would now be barred from recovering any and all post-offer attorney's fees, including fees incurred litigating the attorney's fees issue. *See Guerrero,* 70 F.3d at 1113–14; *see also Marquez v. Harper Sch. Dist. No. 66,* 2012 WL 2469545, at *13–14 (D.Or. June 26, 2012) (denying plaintiff's supplemental motion for attorney's fees for hours spent preparing fee petition where plaintiff accepted Rule 68 offer that contained language limiting plaintiff to attorney's fees and costs incurred prior to the date of the offer), *aff'd and rev'd on other grounds,* 546 Fed.Appx. 659, 660 (9th Cir.2013).

Because Plaintiffs did not accept the Offer and obtained a less favorable judgment, the plain language of Rule 68(d) and *Marek* bar them from recovering all post-offer fees, including fees incurred litigating the attorney's fees issue. *See* Fed. R.Civ.P. 68(d) ("If the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the *costs incurred after the offer was made.*") (emphasis added); *Marek,* 473 U.S. at 10, 105 S.Ct. 3012 ("Civil rights plaintiffs—along with other plaintiffs—who reject an offer more favorable than what is thereafter recovered at trial will not recover attorney's fees for services performed after the offer is rejected."); *Haworth v. State of Nevada,* 56 F.3d 1048, 1051 (9th Cir.1995) (*Marek* held that because "the 1983 statute defined costs to include attorney fees, Rule 68 applied to bar a recovery for *any* attorney fees incurred after a Rule 68 offer was made when the plaintiff recovered less by judgment than the settlement offer") (emphasis added); *Strauss v. Springer,* 817 F.Supp. 1237, 1253–54 (E.D.Pa.1993) (plaintiff who rejected more favorable Rule 68 offer was not entitled to any post-offer costs, including attorney's fees related to preparation of fee petition). Indeed, it would be contrary to Rule 68's policy of encouraging settlement to permit Plaintiffs to recover post-offer fees they would have been denied had they *accepted* Defendant's settlement offer.

■■■ In comparing the favorability of a Rule 68 offer and the judgment a § 1983 plaintiff obtains after rejecting an offer of judgment, a court must include a plaintiff's costs, including attorney's fees, accrued at the time the offer was made. *See Corder v. Gates,* 947 F.2d 374, 380 n. 9 (9th Cir. 1991). Defendant offered (1) $10,100 to Plaintiffs Dowd and Saltsburg each and $5,100 to Plaintiffs Demian, La Grossa, Anthony Brown, Pino, Garcia and Castro each, plus (2) costs incurred prior to the date of the Offer, including attorney's fees, in an amount to be determined by the Court. (Dkt. No. 387–2 at 3). The jury awarded Plaintiffs $10 in nominal damages, and the Court entered judgment in Plaintiffs' favor in this amount. (Dkt. Nos. 374 & 386). Thus, Defendant's offer of judgment was more favorable than the judgment that Plaintiffs ultimately obtained, and Plaintiffs may not recover any costs, including attorney's fees, incurred after December 17, 2013.

### 4. Defendant Is Entitled To Its Costs Incurred After December 17, 2013

■ Judgment was entered in Plaintiffs' favor on February 10, 2014. (Dkt. No. 376). On February 27, 2014, the Court entered an amended judgment, to clarify the terms of the final judgment. (Dkt. No. 386). On March 10, 2014, Defendant filed a motion seeking $26,389.26 in costs incurred after December 17, 2013. (Dkt. No. 387). Plaintiffs argue that Defendant is barred from recovering its costs because "the City failed to file the requisite Bill of Costs under the [Central District's] Local Rules." (Dkt. No. 414 at 6 (citing Local Rule 54–2.1)). Defendant contends that because the City is not seeking its costs as a "prevailing party" under Federal Rule of Civil Procedure 54, "the procedural requirements for a prevailing party seeking its costs under Rule 54 are not applicable." (Dkt. No. 431 at 8). Defendant claims that because Rule 68 does not provide a specific procedure by which a party is to request its costs, it properly followed the general procedure set forth in Federal Rule of Civil Procedure 7(b). *Id.*

■ The Federal Rules of Civil Procedure "do not provide deadlines for Rule 68 motions" and "district courts are free to fix deadlines for these motions in their local rules." *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 60 F.3d 305, 309 (7th Cir.1995) (noting that local rules prescribing deadlines for Rule 54(b) motions are not automatically applicable to Rule 68 motions for costs); *see also D.S. v. East Porter Cnty. Sch. Corp.*, 981 F.Supp.2d 805, 813–14 (N.D.Ind.2013) (request for attorney's fees pursuant to state counterpart to Rule 68 was not governed by Rule 54(d)(2)(B)'s fourteen-day deadline).

Although the Central District's Local Rules do not expressly provide a deadline for filing a motion for costs pursuant to Rule 68, Local Rule 54–11 provides that "Any motion for an award of costs not governed by [Fed.R.Civ.P.] 54(d) . . . shall be served and filed within fourteen (14) days after the entry of judgment or other final order, unless otherwise ordered by the Court. Such motions and their disposition shall be governed by L.R. 7–3, et seq." Local Rule 54–11 therefore governs the timing of a motion for costs pursuant to Rule 68 because such a motion constitutes "a motion for an award of costs not governed by [Fed.R.Civ.P.] 54(d)."

Defendant filed its Motion for Costs twenty-eight days after the Court entered judgment on February 10, 2014, but only eleven days after the Court entered the amended judgment on February 27, 2014. Local Rule 54–11 required Defendant to file its Motion for Costs within fourteen days of the Court's "entry of judgment or other final order. . . ." Because the Court's February 27, 2014 entry of judgment qualifies as an "entry of judgment or other final order," the City's Motion for Costs is timely. However, even if Defendant's motion were untimely, the Court would exercise its discretion to entertain it. *See* C.D. Cal. L.R. 7–12 ("The Court *may* decline to consider any memorandum or other document not filed within the deadline set by order or local rule.") (emphasis added); *Nunley v. City of Los Angeles*, 52 F.3d 792, 795 (9th Cir.1995) (district court has discretion to depart from local roles " 'where it makes sense to do so and substantial rights are not at stake' "); *cf. Star Northwest Inc. v. City of Kenmore*, 280 Fed.Appx. 654, 658 (9th Cir.2008) (district court had discretion to hear untimely Rule 54 motion for attorney's fees and costs). The Court created the potential for confusion when it entered the amended judgment on February 27, 2014, and Defendant should not be penalized for filing its Motion for Costs within fourteen days of this final judgment.

As discussed above, Defendant made a valid Rule 68 offer of judgment on Plaintiffs on December 17, 2013. Plaintiffs rejected the Offer and received a less-favorable judgment at trial. The City is therefore entitled to the taxable costs it incurred in this litigation post-dating December 17, 2013. *See* Fed.R.Civ.P. 68(d); *Champion Produce, Inc. v. Ruby Robinson Co., Inc.*, 342 F.3d 1016, 1026 (9th Cir.2003) ("A plaintiff that rejects a Rule 68 offer in excess of the judgment ultimately obtained at trial must bear its own and the defendant's post-offer costs."). The Court addresses the categories of costs below.

■ First, Defendant requests $10,383 for daily trial transcripts. (Dkt. No. 387 at 5). Pursuant to 28 U.S.C. § 1920(2), a court may award costs for "printed or electronically recorded transcripts necessarily obtained for use in the case[.]" Similarly, Local Rule 54–3.4 permits a party to recover the cost of daily trial transcripts "if requested by the Court or prepared pursuant to stipulation." Generally, daily trial transcript costs should not be awarded absent court approval prior to the trial. *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1184 (Fed.Cir.1996). "However, a district court may overlook the lack of prior approval if the case is complex and the transcripts proved invaluable to both the counsel and the court." *Id.*

■ The Court required the parties in this case to cite to specific pieces of testimony when making evidentiary objections and arguing the proposed jury instructions. Daily trial transcripts were therefore invaluable, allowing the parties to set forth focused, specific arguments that aided the Court in the resolution of the complex issues in this case. Just as in *Manildra Milling Corp.*, daily trial transcripts were not only "vital to the parties' prepa-

ration and presentation of the case, but they also proved critical to the court's management of the litigation." *Id.* (citing lower court's reasoning). Thus, Defendant is entitled to $10,383 in costs for daily trial transcripts.

■ Second, Defendant requests $836.03 in costs for an aerial photograph and map of the Boardwalk that the parties used as demonstrative exhibits throughout the trial. (Dkt. No. 387 at 5). Both § 1920 and Local Rule 54–3.10 permit a court to award costs incurred for the exemplification and copying of documents. "In the context of § 1920, 'exemplification and copies of papers' has been interpreted to include all types of demonstrative evidence, including photographs and graphic aids." *Maxwell v. Hapag–Lloyd Aktiengesellschaft, Hamburg*, 862 F.2d 767, 770 (9th Cir.1988). Moreover, Local Rule 54–3.12 expressly authorizes the court to tax as costs "visual aids reasonably necessary to assist the jury or the Court in understand the issues at trial[.]" *See also Little Oil Co., Inc. v. Atlantic Richfield Co.*, 852 F.2d 441, 448 (9th Cir.1988) (under § 1920 and the Central District's Local Rules, courts have discretion to award costs for visual aids without a prior court order). The parties used the aerial photograph and map of the Boardwalk throughout the trial in order to clearly and efficiently present the case to the jury. The Court finds that these visual aids were integral to the jury's understanding of the issues and the efficient conduct of the trial. Defendant is therefore entitled to $836.03 in costs for the aerial photograph and map of the Boardwalk.

■ Third, Defendant seeks $2,165.90 in costs for trial exhibit notebooks. (Dkt. Nos. 387 at 5; 431 at 10). As discussed above, § 1920 permits reimbursement for the "costs of making copies of any materi-

als where copies are necessarily obtained for use in the case[.]" *See also* C.D. Cal. L.R. 54–3.10 (court may tax as costs the costs of "copies of documents or other materials admitted into evidence....."). The Court required the parties to prepare exhibit notebooks, and the use of the notebooks unquestionably facilitated the orderly and expeditious conduct of the trial. Accordingly, Defendant is entitled to $2,165.90 in costs for trial exhibit notebooks.

 Fourth, Defendant seeks $13,004.25 in costs for trial technician services. (Dkt. No. 387 at 5). However, neither § 1920 nor Local Rule 54–3 provides that such costs are taxable, and Defendant is therefore not entitled to reimbursement for these costs. *See, e.g., Plantronics, Inc. v. Aliph, Inc.,* 2012 WL 6761576, at *9 (N.D.Cal. Oct. 23, 2012) (costs for technical support used at *Markman* hearing not recoverable); *Am. Color Graphics, Inc. v. Travelers Prop. Cas. Ins. Co.,* 2007 WL 832935, at *3 (N.D.Cal. March 19, 2007) (fees for video technician not taxable (citing *Coats v. Penrod Drilling Corp.,* 5 F.3d 877, 891 (5th Cir.1993))).

In sum, the Court grants Defendant's Motion for Costs in part and awards the City **$13,384.93** in costs incurred after December 17, 2013.

## C. *Plaintiffs Are Entitled To Reasonable Attorney's Fees Incurred Prior To December 17, 2013*

As discussed above, Defendant's Rule 68 Offer bars Plaintiffs from recovering fees and costs incurred prior to the date of the Offer, December 17, 2013. However, Plaintiffs "prevailed" in this litigation and therefore may recover their pre-December 17, 2013 fees and costs.

### 1. Lodestar Method

 "In the Ninth Circuit, the customary method of determining the permissible amount of attorney's fees under § 1988 is the 'lodestar' method[,]" *Ballen v. City of Redmond,* 466 F.3d 736, 746 (9th Cir.2006), which "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 551, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010). Thus, the "lodestar" is "the presumptively reasonable rate, which is reached by multiplying the number of hours reasonably expended by the prevailing party with a reasonable hourly rate, then making any adjustments as necessary to account for factors not already subsumed within the initial lodestar calculation." *Mendez v. Cnty. of San Bernardino,* 540 F.3d 1109, 1129 (9th Cir. 2008) (citing *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975) (listing 12 factors bearing on the reasonableness of a fee award)). Because there is a "strong presumption" that the lodestar figure represents a reasonable fee, the favored procedure is to adjust the reasonable number of hours or reasonable hourly rate at the first step of the inquiry, rather than adjusting the lodestar after it has been calculated based on reasonableness factors subsumed in the analysis at step one of the inquiry.[11] *See Morales v. City of San Rafael,* 96 F.3d 359, 364 n. 9 & 10 (9th Cir.1996). Where, as here, a prevail-

---

**11.** Factors presumptively taken into account at step one of the lodestar calculation include (1) the novelty and complexity of the issues in the litigation, (2) the special skill and experience of counsel, (3) the quality of representa- tion, (4) the results obtained, and (5) the contingent nature of the fee agreement. *See Gonzalez v. City of Maywood,* 729 F.3d 1196, 1209 n. 11 (9th Cir.2013).

ing party achieves success on some, but not all of its claims, a court must also consider the extent of the plaintiff's success in determining the size of a fee award. *See Hensley,* 461 U.S. at 440, 103 S.Ct. 1933 (the extent of a plaintiff's success is a "crucial factor in determining the amount of an award of attorney's fees under [§ 1988]" and "[a] reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole"); *Mendez,* 540 F.3d at 1130 (district court is "obligated" to consider a plaintiff's extent of success).

### 2. Reasonable Hourly Rates

In computing the lodestar amount, a district court must determine a reasonable hourly rate to use for the attorneys who worked on a plaintiff's behalf throughout the litigation in question. *See Gonzalez,* 729 F.3d at 1205. "The 'prevailing market rates in the relevant community' set the reasonable hourly rate for purposes of computing the lodestar amount." *Id.; see also Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (" '[R]easonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant legal community, regardless of whether plaintiff is represented by private or nonprofit counsel."). "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541. When determining a reasonable hourly rate, the "relevant legal community" is generally the forum in which the district court sits, and "the proper scope of comparison ... extends to all attorneys in the relevant community en-

gaged in 'equally complex Federal litigation,' no matter the subject." *Prison Legal News v. Schwarzenegger,* 608 F.3d 446, 454–55 (9th Cir.2010). Satisfactory evidence of the prevailing market rate may consist of a plaintiff's attorney's affidavit, other attorneys' affidavits regarding prevailing fees in the community, and rate determinations in other cases. *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 980 (9th Cir.2008).

In *Missouri v. Jenkins by Agyei ("Jenkins"),* 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), the Supreme Court recognized that compensation received several years after an attorney renders his services "is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings." *Id.* at 283, 109 S.Ct. 2463. Accordingly, "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of [§ 1988]." *Id.* at 284, 109 S.Ct. 2463 (footnote omitted); *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley"),* 483 U.S. 711, 716, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("In setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value."). The Ninth Circuit therefore "recognize[s] that district courts have the discretion to compensate prevailing parties for any delay in the receipt of fees by awarding fees at current rather than historic rates in order to adjust for inflation and loss of the use funds." *Gates v. Deukmejian,* 987 F.2d 1392, 1406 (9th Cir.1992). Courts are not, however, required to enhance an attorney's hourly rate for delay, as *Jenkins* simply permits

an adjustment where appropriate. *Deukmejian,* 987 F.2d at 1406.

Four attorneys represented Plaintiffs in this litigation, and Plaintiffs request the following hourly rates:

| | |
|---|---|
| Mr. Rohde: | $850 per hour |
| Mr. Victoroff: | $750 per hour |
| Mr. Oppenheim: | $420 per hour |
| Mr. Talei: | $250 per hour |

(*See* Dkt. No. 389 at 14). Defendant argues that these rates are unreasonably high and proposes the following alternative hourly rates: $750 per hour for Mr. Rohde, $500 per hour for Mr. Victoroff, $250 per hour for Mr. Oppenheim and $150 per hour for Mr. Talei. (Dkt. No. 417 at 26). The Court will address each attorney's rate in turn.

### a. Mr. Rohde's Hourly Rate

■ On March 9, 2011, the Court granted Plaintiffs' requests to substitute Mr. Rohde as their counsel of record in this litigation. (Dkt. No. 53). In support of a rate of $850 per hour for Mr. Rohde, Plaintiffs have submitted Mr. Rohde's declaration and the declarations of four additional Los Angeles attorneys who have significant experience in the practice of law and are familiar with the prevailing market rates for attorneys who handle complex, plaintiff-side civil rights litigation in the Central District. (*See* Dkt. Nos. 390–94).

Mr. Rohde graduated from Columbia Law School in 1969 and has been a member of the California State Bar since 1972. (Dkt. No. 390 at 2). Mr. Rohde states that he has spent a "[s]ignificant portion" of his 43–year legal career litigating First Amendment issues, including numerous cases that resulted in published decisions in state and federal court. (*See id.*). Mr. Rohde has been designated a "Super Lawyer" every year since 2008. (*See id.*). Recently, Mr. Rohde represented the prevailing party in *Hunt v. City of Los Angeles,*

638 F.3d 703 (9th Cir.2011), *affirming* 601 F.Supp.2d 1158 (C.D.Cal.2009), a case closely related to the instant action that also involved the City's attempt to regulate vending activity on the Boardwalk. (*See id.* at 2–3). In *Hunt,* in 2009, the District Judge approved a $700 hourly rate for Mr. Rohde. (*See Michael Hunt; Matthew Dowd v. City of Los Angeles,* CV 06–04691 DD (SSx), Dkt. No. 214 at 17). However, on appeal, the Ninth Circuit increased Mr. Rohde's rate to $750 per hour in 2012. (*See id.* at 18–19).

In addition to Mr. Rohde's declaration, Plaintiffs submitted the declarations of Barrett Litt, Esq., Carol Sobel, Esq., Anne Richardson, Esq. and Douglas Mirell, Esq. to justify Mr. Rohde's $850 per hour rate. Mr. Litt is an accomplished civil rights attorney who graduated from UCLA School of Law in 1969 and has practiced in California since 1984. (Dkt. No. 391 at 2). Mr. Litt's declaration contains extensive analysis of attorney's fees awarded in complex civil rights cases in the Central District and other comparable forums. For example, in 2012, an attorney with fifty-one years of experience received an hourly rate of $860 per hour. (Dkt. No. 391 at 17) (citing *Communities Actively Living Independent and Free v. City of Los Angeles,* CV 09–00287 CBM (RZx), Dkt. No. 255). In 2009, Mr. Litt received $800 per hour. (*Id.*) (citing *Multi–Ethnic Immigrant Workers Org. Network v. City of Los Angeles,* 2009 WL 9100391 (C.D.Cal. June 24, 2009)). In 2012, an attorney with thirty-eight years of experience received $825 per hour, and in 2010 an attorney with thirty-four years of experience received $930 per hour. (*Id.* at 18) (citing *Pierce v. Cnty. of Orange,* 905 F.Supp.2d 1017, 1035–39 (C.D.Cal.2012)). Ms. Sobel is a seasoned civil rights attorney familiar with complex civil rights litigation in the Central District. (Dkt. No. 392 at 2). Based

on her own billing rate ($875 per hour), past fee awards in comparable cases before this Court ($725 per hour in 2010, $710 per hour in 2009, $695 per hour in 2008), and her familiarity with Mr. Rohde's work, (*see id.* at 2–3, 6), Ms. Sobel concludes that Mr. Rohde's $850 per hour rate is reasonable.

Ms. Richardson, a partner at the law firm of Hadsell Stormer Richardson & Renick LLP, which specializes in plaintiff-side employment law and civil rights work, also finds that, based on her experience generally and familiarity with Mr. Rohde in particular, Mr. Rohde's quoted rate is reasonable. (*See* Dkt. No. 393). Similarly, Mr. Mirell, a partner at Harder, Mirell & Abrams LLP who concentrates his practice on First Amendment and entertainment industry lawsuits, concludes that $850 per hour is an accurate reflection of the prevailing market rate for the legal work that Mr. Rohde performed in this litigation. (*See* Dkt. No. 394).

▆▆ Defendant has offered the declaration of Deborah J. Fox, a principal at Meyers, Nave, Riback, Silver & Wilson, to challenge the hourly rates that Plaintiffs use in calculating the lodestar amount. (*See* Dkt. No. 419). Ms. Fox's declaration indicates that Defendant's lead trial lawyers, who are experienced attorneys in their own right, charged rates substantially lower than what Plaintiffs have requested for Mr. Rohde's services ($300 for Mr. Skinner and $275 for Ms. McIntosh). (*Id.* at 3–4). Similarly, Ms. Fox states that she is familiar with the rates charged by law firms that represent public and private clients in lawsuits involving constitutional

law issues, and that the most senior partners at these firms charge no more than $500 per hour. (*Id.* at 4–5).[12]

At oral argument, Mr. Rohde argued that any downward adjustment of his $850 rate is improper because it would, in effect, compensate him at historic, rather than current market rates. Mr. Rohde asserted that pursuant to *Delaware Valley* and *Jenkins,* the Court must award him his full current hourly rate. The Court disagrees that it must apply the $850 hourly rate that Plaintiffs have requested for Mr. Rohde. The Court will award Mr. Rohde a higher rate than the $750 per hour he received in 2012 to account for changing market conditions and the delay he experienced in receiving compensation for his work in this litigation. However, the Court finds that an $850 hourly rate is not the proper rate here.

First, Mr. Rohde has not offered any evidence that his work in this litigation precluded him from taking other, paying work, and this fact undermines his claim that $850 per hour is the only rate that can fully compensate him for the time he devoted to this case. *Compare with Deukmejian,* 987 F.2d at 1406–07 (awarding current market rates where "plaintiffs' counsel presented evidence that their work on this case precluded them from engaging in substantial work on other cases that would have paid at full market rates[ ]" and noting that "[t]hese potential earnings, like interest payments and investment opportunities foregone, are deserving of compensation").

Second, Plaintiffs' rejection of Defendant's Rule 68 offer significantly extended

---

**12.** Defendant also contends that Mr. Rohde should be limited to the $750 per hour rate that he referenced in a December 1, 2013 e-mail to Defendant's counsel during settlement talks. (*See* Dkt. No. 417 at 25 (citing Dkt. No. 421–3 at 130)). However, courts "generally refrain from referencing proposed settlement agreements in light of Federal Rule of Evidence 408" unless both parties seek to introduce evidence of settlement negotiations and discussions. *See McCown v. City of Fontana,* 565 F.3d 1097, 1104 n. 4 (9th Cir.2009).

the duration of this litigation, thereby raising the possibility that the prevailing rates for counsel's services increased during a period of time in which Plaintiffs were incurring fees that they are now barred from recovering. Similarly, by rejecting the Offer, Plaintiffs partially caused the delay in payment that they now claim compels an $850 hourly rate for Mr. Rohde. In light of Rule 68's purpose and operation, the Court finds that Plaintiffs cannot fairly justify a fee award at prevailing market rates that would be lower but for time spent litigating this action after they rejected Defendant's offer of judgment.

Third, Plaintiffs argue that the Court cannot rely on Defendant's declaration regarding defense counsel's hourly rates as a basis for departing from Plaintiffs' requested hourly rates. In support of this argument, Plaintiffs cite *Trevino v. Gates*, 99 F.3d 911 (9th Cir.1996). In *Trevino*, an excessive force case, the Ninth Circuit held that a district court erred where, in determining the plaintiff's attorney's reasonable hourly rate, it relied, "as a starting point[,]" on the rates paid by the city to private attorneys in similar cases. *Id.* at 925. The *Trevino* court explained that "[p]rivate attorneys hired by a government entity to defend excessive force cases are not in the same legal market as private plaintiff's attorneys who litigate civil rights cases." *Id.* The court found that attorneys hired by government entities to defend excessive force cases 'do not "act[ ] as 'private attorneys' at all[ ]" because they often charge lower rates to win the government's repeat business. *Id.* (citing *Brooks v. Georgia State Bd. of Elections*, 997 F.2d 857, 869–70 (11th Cir.1993)).

According to Plaintiffs, *Trevino* categorically bars this Court from considering the rates of defense counsel in this and comparable cases to determine the reasonable hourly rate for Plaintiffs' counsel. Howev-

er, the Court does not read *Trevino* in such absolutist terms. While *Trevino* holds that a court may not begin or otherwise anchor its analysis of a plaintiff's attorney's rate by looking to the rates a city pays defense counsel in comparable litigation, the Ninth Circuit did not condemn defense counsel's rates as wholly irrelevant to the "reasonable hourly rate" inquiry. *See id.* (relying on *Brooks* and explaining that the Eleventh Circuit held it was error for the district court to " 'rely *so heavily* on the rate paid to opposing counsel' ") (emphasis added). Indeed, less than two years after *Trevino*, a three-judge panel of the Ninth Circuit expressly rejected the idea that *Trevino* bars all consideration of defense counsel's fees in civil rights cases. *See Puckett v. Yamhill Cnty.*, 145 F.3d 1340, at *1–3 (9th Cir.1998) (unpublished). The *Puckett* court explained that "[i]n the absence of evidence of the *actual* fees charged by *both* defense and plaintiff's lawyers, it would be difficult to police against artificially inflated fees supported by only one segment of the bar's affidavits in connection with one another's fee petitions." *Id.* at *2 (emphasis in original). The Ninth Circuit concluded that a district court "must be able to look to the hourly rates charged by members·of both civil rights bars to assure itself that a fee award reflects a commercially reasonable hourly rate that is neither artificially inflated nor laden with contingency enhancement." *Id.* In *Puckett*, the Ninth Circuit upheld the district court's decision to reduce the plaintiff's attorney's hourly rate because the lower court did not rely "exclusively upon fees paid by government entities to civil rights defense attorneys[.]" *Id.* at *2–3.

Here, Defendant's counsel's rates, and the rates charged by defense counsel in comparable cases, are significantly lower than the $850 per hour that Plaintiffs have requested for Mr. Rohde's services. While

this fact, in isolation, does not warrant a rejection of Plaintiffs' requested rate, this disparity, taken together with the Court's other findings, lends additional support to a downward departure from $850 per hour.

For the foregoing reasons, and in light of Mr. Rohde's $750 hourly rate in 2012, the Court finds that a reasonable hourly rate for Mr. Rohde is $775. *See, e.g., Barjon v. Dalton,* 132 F.3d 496, 503 (9th Cir.1997) (denial of interest to account for delay was proper where attorney received a high across-the-board rate and she was not paid until approximately one year after the plaintiffs prevailed). This rate reflects both the rate that the Ninth Circuit deemed appropriate in 2012 and a $25 an hour increase for the work performed in the following year, 2013, even for work performed prior to 2013.

### b. Mr. Victoroff's Hourly Rate

█ Plaintiffs request that the Court calculate the lodestar amount using a $750 per hour billing rate for Mr. Victoroff. (Dkt. No. 389 at 14). Mr. Victoroff was admitted to practice in California in 1979 and worked as Mr. Rohde's law partner between 1987 and 2013, during which time he "assisted Mr. Rohde with virtually every litigated First Amendment and constitutional law matter handled by [their] firm . . . ." (Dkt. No. 430 at 2). Mr. Victoroff's experience also includes "over 35 years of nearly daily experience counseling writers, musicians, filmmakers, teachers, school districts, bloggers, critics and others on the limits of First Amendment protections in connection with various creating endeavors . . . ." (*Id.* at 3). The declarations that Plaintiffs submitted in support of Mr. Rohde's $850 per hour fee also support Mr. Victoroff's hourly rate. Attorneys with significantly less experience received hourly rates between $675 and $695 per hour in consumer wage and hour class actions in 2009 and 2010, (*see* Dkt.

No. 391 at 19), and comparably experienced lawyers who handle complex commercial litigation in federal court received fees ranging from $680 per hour to $940 per hour between 2009 and 2012. (*See id.* at 20). Moreover, attorneys with substantially less experience than Mr. Victoroff received hourly rates exceeding the $500 per hour rate that Plaintiffs request. (*See id.* at 20–21).

Based on this information, Mr. Litt finds that $750 per hour is a reasonable rate for Mr. Victoroff's services. Ms. Sobel similarly concludes that this rate is reasonable given Mr. Victoroff's "excellent reputation as a skilled and experienced attorney" in Los Angeles who is well-known as a First Amendment litigator. (Dkt. No. 392 at 6).

Defendant challenges Mr. Victoroff's rate on the ground that "[e]ven a cursory review of attorney Victoroff's website indicates that he practices in intellectual property law and business litigation matters[,]" and not First Amendment law. (Dkt. No. 417 at 25). Again, Ms. Fox's declaration shows that Defendant's counsel's hourly rates were substantially lower than Mr. Victoroff's in this case despite their extensive experience representing public entities in land use and constitutional matters. (*See* Dkt. No. 419 at 3–4). Ms. Fox also states that the rates charged by other defense counsel in lawsuits involving constitutional law issues fall well below $750 per hour. (*Id.* at 4–5).

Defendant also directs the Court to a March 4, 2014 e-mail from Mr. Rohde indicating that Mr. Victoroff's rate changed during this litigation, increasing from $500 per hour to $750 per hour. (*See id.* at 25). Mr. Rohde's March 4, 2014 e-mail and attachment to Ms. McIntosh, which contain "detailed and comprehensive reports of the services rendered by [Plaintiffs'] four attorneys in this case[,]" show that Mr. Victoroff's hourly rate was $500 until

June 22, 2012 and $750 thereafter. (*See* Dkt. No. 421–2 at 17, 70–79). However, the bills that Plaintiffs submitted to the Court in connection with their fee petition quote Mr. Victoroff's rate as $750 throughout the litigation in its entirety. This inconsistency in Mr. Victoroff's billing rate is another factor for the Court to consider in analyzing Plaintiff's across-the-board request for $750 per hour.

At oral argument, Mr. Rohde explained that in preparing billing statements for this case, he entered $500 per hour merely as a placeholder, and not a binding assessment of Mr. Victoroff's prevailing market rate. However, assuming that $500 per hour was a "placeholder," it would be irrational to use a "placeholder" that was not close to an appropriate evaluation of an attorney's hourly rate. Thus, the Court may still weigh this stated rate's relevance in evaluating the proper hourly rate. To the extent Plaintiffs argue that the market rate for Mr. Victoroff's services changed over time, the Court is not persuaded that Mr. Victoroff's hourly rate increased by 50%, from $500 to $750, over such a short period of time. This level of drastic increase seems even less plausible when one compares the placeholder rates for Plaintiffs' other attorneys with the rates requested in Plaintiffs' Motion for Attorneys' Fees.[13]

Based on this billing irregularity, Mr. Victoroff's more limited experience in complex civil rights cases as compared to Mr. Rohde, Mr. Victoroff's limited participation in this litigation (Mr. Rohde was lead counsel), and the significantly lower billing rates identified in Ms. Fox's declaration, the Court finds that $750 per hour is not an appropriate rate for Mr. Victoroff. Rather, a rate of $675 per hour is more reasonable. (*See* Dkt. No. 391–2 at 25–26 (attorneys with 31–39 years of experience received rates ranging from $625 per hour to $940 per hour)).

c. Mr. Oppenheim's Hourly Rate

■ Plaintiffs seek an hourly rate of $420 for the work that Mr. Oppenheim performed throughout this litigation. (Dkt. No. 389 at 19). Starting in 2007, Mr. Oppenheim served as a law clerk for Carol Sobel, Esq. Although Mr. Oppenheim appears to have frequently worked on First Amendment issues while clerking for Ms. Sobel, he primarily practiced labor law from late 2009 through mid–2013. (*See* Dkt. No. 429 at 1–2). As a labor attorney, Mr. Oppenheim was only "periodically called upon to analyze or present arguments concerning the First Amendment right to association[.]" (*Id.* at 2). There is no evidence, however, that Mr. Oppenheim litigated any First Amendment cases in private practice as a labor and employment attorney. Since mid–2013, Mr. Oppenheim has worked primarily on First Amendment issues at the ACLU of Southern California, including his work in the instant litigation. (*Id.* at 2–3).

In Ms. Sobel's declaration, she states that she knows Mr. Oppenheim well, having worked with him "for several months while he was awaiting his Bar results and a few months after his admission." (Dkt.

---

**13.** In the billing statement attached to Mr. Rohde's March 4, 2014 e-mail, Mr. Rohde's hourly rate is $850, Mr. Oppenheim's hourly rate starts at $315 and increases to $420, and Mr. Talei's hourly rate is $250. (*See* Dkt. No. 421–2 at 18, 56, 80). In their Motion for Attorneys' Fees, Plaintiffs request hourly rates of $850, $420 and $250 for Mr. Rohde, Mr. Oppenheim and Mr. Talei respectively. Thus, with the exception of Mr. Victoroff's rate, each attorney's placeholder rate equals or more-closely tracks the rates that Plaintiffs now request. Plaintiffs have not adequately explained why Mr. Victoroff's hourly rate leapt from $500 to $750, and Plaintiffs' contention that Mr. Victoroff's actual, across-the-board rate is $750 is therefore unpersuasive.

No. 392 at 6). Based on her work with Mr. Oppenheim, Ms. Sobel opines that "Mr. Oppenheim is also highly skilled and experienced." (*Id.* at 6). She therefore concludes that his requested rate is reasonable, "if not below median." (*Id.* at 6). The data in Mr. Litt's declaration also lends some support to Mr. Oppenheim's $420 per hour rate. (*See* Dkt. No 391 at 22–23).

Despite these declarations, the Court is not persuaded that $420 per hour is the prevailing market rate for an attorney in the Central District with Mr. Oppenheim's experience. Ms. Sobel states that Mr. Oppenheim continued working for her for a few months after his December 2007 admission to the Bar, (*see* Dkt. No. 392 at 6), but Mr. Rohde's declaration indicates that Mr. Oppenheim stopped working for Ms. Sobel in January 2008. (*See* Dkt. No. 390 at 8). In April 2008, Mr. Oppenheim joined the Law Office of Mark Brifman. (*See id.*). However, Plaintiffs have not presented any evidence concerning the nature of Mr. Oppenheim's work at Mr. Brifman's firm. In October 2009, Mr. Oppenheim left Mr. Brifman's firm and, two months later, joined Schwartz, Steinsapir, Dohrmann & Somers LLP as a labor and employment litigation associate. (*See id.*). Mr. Oppenheim joined the ACLU of Southern California in September 2013, (*see id.* at 7), and he started work on this litigation on September 5, 2013. (*See* Dkt. No. 390–1 at 54).

Based on this timeline, the Court finds that Mr. Oppenheim did not practice civil rights law or complex federal litigation as an admitted member of the State Bar prior to joining the ACLU of Southern California.[14] Once Mr. Oppenheim joined the ACLU, it appears that he was immediately assigned to this matter. Although Mr. Oppenheim graduated from law school in 2007, it would be unreasonable to assign him the same hourly rate as an attorney who has consistently practiced civil rights or complex commercial litigation for 5 to 7 years. Based on Mr. Litt's declaration, attorneys with 1 to 3 years of experience typically receive $275 to $400 per hour for services provided in civil rights cases and other complex litigation. (*See* Dkt. No. 391 at 27). Given Mr. Oppenheim's limited experience and the absence of specific information regarding the nature of Mr. Oppenheim's work experience, the Court concludes that a reasonable hourly rate for Mr. Oppenheim is $375.[15] *See, e.g., Dubose v. Cnty. of Los Angeles,* 2012 WL 2135293, at *3 (C.D.Cal. June 11, 2012) (awarding $325 per hour to attorney with nine years of experience who had minimal experience litigating civil rights claims).

d. Mr. Talei's Hourly Rate

 Plaintiffs seek an hourly rate of $250 for Mr. Talei. Although Plaintiffs have not offered any declaration from Mr. Talei in support of their request for a $250 hourly rate, Mr. Rohde's declaration indicates that Mr. Talei graduated from law school in 2011 and was admitted to prac-

---

**14.** At the May 5, 2014 hearing, Mr. Oppenheim did not address the Court's concerns regarding his limited experience prior to joining this litigation. Although Mr. Rohde argued that Mr. Oppenheim had the requisite experience to justify a $420 hourly rate, he did not specifically address the Court's reasons for reducing Mr. Oppenheim's rate.

**15.** The Court also notes that the billing record attached to Mr. Rohde's March 4, 2014 e-mail lists Mr. Oppenheim's hourly rate as $315 as of September 5, 2013, *i.e.,* the day he joined this litigation. (Dkt. No. 421–2 at 56). His rate then increased the next day to $420 per hour. (*See id.*). Just as a similar, already-discussed billing irregularity counseled against granting Plaintiffs' requested $750 hourly rate for Mr. Victoroff, this billing inconsistency calls into doubt Plaintiffs' $420 per hour request for Mr. Oppenheim's time.

tice in California that same year. (Dkt. No. 390 at 8). Before joining this litigation on July 18, 2012, (*see* Dkt. No. 390–1 at 51), Mr. Talei was an associate at the L.A. Tech & Media Law Group, where he primarily worked on intellectual property prosecution, business transactions and commercial litigation. (*See* Dkt. No. 390 at 8–9). Accordingly, when Mr. Talei commenced participation in this lawsuit, he had less than one year of legal experience and no experience litigating civil rights or other complex federal cases.

Mr. Litt states in his declaration that $250 per hour is a reasonable rate for Mr. Talei and that "$250 is definitely a low rate for a three year attorney doing complex litigation." (Dkt. No. 391 at 26). However, the latest billing record for Mr. Talei is October 25, 2012, (*see* Dkt. No. 390–1 at 53). Mr. Talei was not admitted to the State Bar until December 9, 2011.[16] Accordingly, at all times during his participation in this litigation, Mr. Talei had less than one year of experience as a practicing attorney. Mr. Litt's opinion regarding Mr. Talei's rate is therefore unreliable to the extent it improperly compares Mr. Talei to attorneys with three years of complex litigation experience. Ms. Sobel's declaration makes only passing reference to Mr. Talei, noting that although Ms. Sobel is not familiar with Mr. Talei, a $250 hourly rate for his services is reasonable. (Dkt. No. 392 at 6–7).

Given Mr. Talei's lack of legal experience generally and Plaintiffs' failure to submit a declaration from Mr. Talei or any other attorney indicating that Mr. Talei litigated civil rights or other complex federal cases prior to joining this litigation, the Court concludes that $250 per hour is not a reasonable rate for Mr. Talei's services. Based on a review of Mr. Litt's

declaration, attorneys in civil rights cases with one to two years of experience receive hourly rates ranging from $265 to $500. Because Mr. Talei had less than one year of experience throughout this litigation, Mr. Talei's hourly rate should fall below these higher rates. Accordingly, the Court finds that an hourly rate of $200 per hour is reasonable for Mr. Talei's services in this lawsuit. *See, e.g., Cruz ex rel. Cruz v. Alhambra Sch. Dist.,* 601 F.Supp.2d 1183, 1194 (C.D.Cal.2009) (awarding $225 per hour for attorney with 2 years of experience and $200 to attorney with 1 year of experience in Title IX case).

In sum, the Court will use the following hourly rates in calculating the lodestar amount:

| | |
|---|---|
| Mr. Rohde: | $775 per hour |
| Mr. Victoroff: | $675 per hour |
| Mr. Oppenheim: | $375 per hour |
| Mr. Talei: | $200 per hour |

### 3. Number Of Hours Reasonably Expended

 Under the lodestar method, a district court must determine "how many hours were reasonably expended on the litigation[.]" *Moreno v. City of Sacramento,* 534 F.3d 1106, 1111 (9th Cir.2008). "The number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client." *Id.* "The party seeking an award of fees must submit evidence supporting the hours worked[,]" and a district court "should exclude from the lodestar amount hours that are not reasonably expended because they are 'excessive, redundant, or otherwise unnecessary.'" *Van Gerwen v. Guarantee Mut. Life Co.,* 214 F.3d 1041, 1045 (9th Cir.2000); *see also Mendez,* 540 F.3d at 1130 (a court may reduce an award for unnecessarily duplicative work).

---

**16.** *See* The State Bar of California Website, Attorney Search for Nathan M. Talei, http:// members.calbar.ca.gov/fal/Member/Detail/281498.

"Thus, to determine whether attorneys for the prevailing party could have reasonably billed the hours they claim to their private clients, the district court should begin with the billing records the prevailing party has submitted." *Gonzalez*, 729 F.3d at 1202. Where billing records include hours that could not be reasonably billed because they are excessive, redundant or otherwise unnecessary, a court should exclude them from the lodestar amount by conducting an hour-by-hour analysis of the fee request or, in the case of a "massive" fee application, making across-the-board percentage cuts that are supported by a concise, but clear explanation justifying the reduction in hours. *See id.* at 1203.

As discussed above, Plaintiffs may not recover for any attorney's fees incurred after December 17, 2013. According to Plaintiffs' billing records, Plaintiffs' attorneys expended the following hours on this litigation as of December 17, 2013:

| | |
|---|---|
| Mr. Rohde: | 615.40 hours |
| Mr. Victoroff: | 269.99 hours |
| Mr. Oppenheim: | 172.74 hours |
| Mr. Talei: | 156.92 hours |

■ Mr. Rohde has volunteered to reduce the hours billed by Plaintiffs' four lawyers in this action by 20% "in an abundance of caution and in the exercise of reasonable billing judgment[.]" (Dkt. No. 390 at 16). Mr. Rohde has made this voluntary reduction to account for (1) Plaintiffs' limited success on the merits, (2) any duplicative work that Plaintiffs' attorneys may have conducted during this litigation, and (3) Plaintiffs' failure to obtain more than nominal damages at trial. (*Id.*). The Court has reviewed Plaintiffs' billing records and concludes that, with the exception of Mr. Talei, a voluntary 20% reduction is reasonable in light of the factors that Mr. Rohde has listed. *See, e.g., DL v. District of Columbia*, 256 F.R.D. 239, 247 (D.D.C.2009) (approving voluntary reduction); *Finkelstein v. Bergna*, 804 F.Supp.

1235, 1239 n. 4 (N.D.Cal.1992) (same). Thus, taking into account Mr. Rohde's 20% reduction, Plaintiffs' attorneys reasonably expended the following hours in this litigation:

| | |
|---|---|
| Mr. Rohde: | 492.32 hours |
| Mr. Victoroff: | 215.99 hours |
| Mr. Oppenheim: | 138.19 hours |

A review of Mr. Talei's billing records indicate that more than 20% of his hours expended on this litigation were unnecessarily excessive and/or duplicative.

Between July 18, 2012 and July 20, 2012, Mr. Talei billed 9.37 hours for reviewing volume I of Mr. Brown's deposition transcript, preparing a summary of his testimony and discussing this summary with Mr. Rohde. (Dkt. 390–1 at 51). The Court finds this time was excessive and duplicative as there is no explanation why Mr. Talei needed to engage in prolonged discussions with Mr. Rohde concerning the summary after dedicating hours to the summary itself. The Court reduces this time to 3 hours.

Between July 21, 2012 and August 26, 2012, Mr. Talei spent 66.85 hours reviewing Plaintiffs' deposition transcripts and preparing and revising summaries of their testimony. (*Id.* at 51–52). The Court finds that this was an excessive amount of time for a relatively straightforward and mechanical task. The Court reduces this time to 30 hours.

At oral argument, Mr. Rohde argued that Mr. Talei's deposition summaries were essential to Mr. Rohde's ability to litigate this case efficiently and effectively. The Court does not second-guess the necessity of Mr. Talei's work or Mr. Rohde's decision to have an attorney (as opposed to a paralegal or legal assistant) review the depositions for errors, input corrections and prepare summaries. However, the Court is not persuaded that Mr. Talei expended a reasonable amount of time on

tasks that, while important, were nevertheless mechanical and repetitive. Contrary to Mr. Rohde's claim, Mr. Talei did not complete his work more efficiently as the case progressed. Between July 22, 2012 and July 24, 2012, Mr. Talei spent approximately eight hours reviewing, revising, correcting and summarizing Mr. La Grossa's deposition testimony. (*Id.* at 51). However, between August 5, 2012 and August 7, 2012, Mr. Talei expended over ten hours completing the same tasks with respect to Mr. Turner's deposition testimony. (*Id.* at 52). This fact supports the Court's decision that Mr. Talei's work on this case was unnecessarily excessive. In sum, the Court has reduced Mr. Talei's hours by 43.22 hours. Accordingly, Mr. Talei reasonably expended 113.7 hours in this litigation.[17]

### 4. Plaintiffs' Lodestar Amount

Based on the foregoing, Plaintiffs' lodestar amount is calculated as follows:

| Attorney | Hourly Rate | Hours Expended | Total Fees |
| --- | --- | --- | --- |
| Mr. Rohde | $775 | 492.32 | $381,548.00 |
| Mr. Victoroff | $675 | 215.99 | $145,793.25 |
| Mr. Oppenheim | $375 | 138.19 | $51,821.25 |
| Mr. Talei | $200 | 113.7 | $22,740.00 |
| | | Total Hours Reasonably Expended | Total Lodestar Amount |
| | | 960.2 | $601,902.50 |

Plaintiffs' lodestar amount is therefore $601,902.50 in attorney's fees.

### 5. Plaintiffs' Extent Of Success

■ "[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988." *Hensley,* 461 U.S. at 440, 103 S.Ct. 1933. Thus, "[w]here a plaintiff has failed to prevail on a claim that is distinct in all respect from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Id.* However, where a lawsuit consists of "related claims, a plaintiff who has won substantial relief should not have his attorney's fees reduced simply because the district court did not adopt each contention raised." Even so, to the extent a plaintiff achieves only "limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Id.* "Under *Hensley,* the reasonableness of a fee award is [therefore] determined by answering two questions: 'First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making the fee award?'" *McCown,* 565 F.3d at 1103 (quoting *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933).

Plaintiffs prevailed on their claims regarding the constitutionality of the amplified sound ban and the application of the Rules of Decorum against Plaintiffs Dowd and Saltsburg. However, they failed on their claims challenging (1) the 2006 Ordinance, (2) the 2008 Ordinance's permit and lottery system, restriction on equipment height, rotation requirement, sunset restriction, and (3) the Rules of Decorum' facial constitutionality. Because Plaintiffs

**17.** 156.92 requested hours − 43.22 hours = 113.7 reasonably expended hours.

were only partially successful in this litigation, the Court must consider the extent of Plaintiffs' success to *Hensley*. *See Morales*, 96 F.3d at 364.

### a. Plaintiffs' Successful And Unsuccessful Claims Are "Related"

■■■■■■ Where a plaintiff is only partially successful in a lawsuit, he may not recover attorney's fees for work performed on unsuccessful claims "unrelated" to his successful ones—such work "cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.'" *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933. In *Hensley*, the Supreme Court noted that "there is no certain method of determining when claims are 'related' or 'unrelated[,]'" but indicated that a plaintiff's claims are related if they either "involve a common core of facts" or are based "on related legal theories." *Id.* The Ninth Circuit, having acknowledged that the test for relatedness under *Hensley* "is not precise," *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 903 (9th Cir.1995) (quoting *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir.1986)), has articulated the relevant inquiry as "whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief is granted." *Thorne*, 802 F.2d at 1141 (internal quotation marks omitted); *see also Schwarz*, 73 F.3d at 903 (same). A court must ask "whether the unsuccessful and successful claims arose out of the same 'course of conduct.' If they didn't[,] they are unrelated under *Hensley*."[18] *Schwarz*, 73 F.3d at 903.

■■■ Analyzed under the standards announced in *Hensley* and its progeny, Plaintiffs' successful and unsuccessful claims are "related." Plaintiffs' challenges to the 2006 and 2008 Ordinances each addressed the City's attempts to regulate vending and expressive activity on the Venice Boardwalk. Although Plaintiffs' various claims challenged different aspects of the Ordinances, they all relate to a single defendant's efforts to regulate the same type of conduct at the same location. Moreover, each claim raises a First Amendment challenge to the Ordinances. That Plaintiffs proved successful only with respect to the amplified sound ban in the 2008 Ordinance does not negate the common core of facts and legal issues—i.e., the City's regulation of vending and expressive activity on the Venice Boardwalk pursuant to LAMC § 42.15—giving rise to this litigation. *Compare McCown*, 565 F.3d at 1103 (not an abuse of discretion to find that plaintiff's unsuccessful wrongful arrest and *Monell* claims and successful excessive force claim were related because each claim, "though brought on the basis of different legal theories against different defendants, arose from a common core of facts, namely [plaintiff's] arrest"); *Webb v. Sloan*, 330 F.3d 1158, 1168–69 (9th Cir.2003) (plain-

---

**18.** In determining whether a plaintiff's claims are unrelated, one relevant consideration is whether it is likely that legal work performed on unsuccessful claims aided the work done on a successful part of the litigation. *See Herrington v. Cnty. of Sonoma*, 883 F.2d 739, 747 (9th Cir.1989); *see also Cabrales v. Cnty. of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir.1991) ("[E]ven if a specific claim fails, the time spent on that claim may be compensable, in full or in part, if it contributes to the success of other claims."). "Ultimately, however ..., the focus is on whether the claims arose out of a common course of conduct. In short, claims may be related if either the facts or the legal theories are the same." *Webb*, 330 F.3d at 1169; *see also Dang*, 422 F.3d at 813 (claims are unrelated only if they are distinctly different legally and factually; claims are related if they involve a common core of facts or are based on related legal theories).

tiff's unsuccessful claim for false arrest against individual officer was related to his successful claims for false imprisonment and malicious prosecution against city because "all of his claims arose out of a common core of facts and a common course of conduct: [p]laintiff's arrest, detention and prosecution"), *with Schwarz,* 73 F.3d at 903–04 (district court did not abuse its discretion in determining that employee's unsuccessful claims that Phoenix office of government agency violated Indian Preference Act, anti-nepotism laws and Title VII prohibition on race discrimination were unrelated to successful claim that Portland office of the same agency imposed a "glass ceiling" in violation of Title VII prohibition on gender discrimination). Similarly, Plaintiffs' as-applied and facial challenges to the Rules of Decorum are related, as both involve First Amendment claims concerning the same defendant's application of the same Rules of Decorum against Plaintiffs Dowd and Saltsburg.

In its Opposition to Plaintiffs' Motion for Attorneys' Fees and Costs, Defendant does not dispute that Plaintiffs' claims are related within the meaning of *Hensley.* Instead, Defendant argues that the Court should dramatically reduce Plaintiffs' fee award because of Plaintiffs' limited success in this litigation, an issue distinct from the related nature of their claims. (*See* Dkt. No. 417 at 18–24). Because Plaintiffs' successful and unsuccessful claims are "related" within the meaning of *Hensley,* the Court must determine whether Plaintiffs' accomplishments justify the lodestar amount. *See Dang v. Cross,* 422 F.3d 800, 813 (9th Cir.2005).

b. Plaintiffs Achieved An Excellent Result And Are Entitled To The Full Lodestar Amount Set Forth Above

At step two of the *Hensley* inquiry, the Court must consider whether Plaintiffs "achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a few award." 461 U.S. at 434, 103 S.Ct. 1933. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee[,]" and a fee award "should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.* The Ninth Circuit has explained that the "bulk of discretion retained by the district court lies" at step two of the *Hensley* inquiry, which, at its core, asks whether a plaintiff's accomplishments warrant the fee amount requested. *See Thomas v. City of Tacoma,* 410 F.3d 644, 650 (9th Cir.2005).

Ninth Circuit case law is clear that attorney's fees awarded under § 1988 "must be adjusted downward where the plaintiff has obtained limited success on his pleaded claims, and the result does not confer a meaningful public benefit." *McCown,* 565 F.3d at 1103. However, it is improper to reduce a plaintiff's fee award based solely on a comparison between the damages awarded and damages sought in a case. *See id.* at 1104 (citing *Rivera,* 477 U.S. at 576, 585, 106 S.Ct. 2686 (Powell, J., concurring)). A rule of strict proportionately that categorically pegs recoverable attorney's fees to damages recovered is "inappropriate ... because it fails to recognize the nature of many, if not most, civil rights cases, in which damages may be limited by law, regardless of the importance of the civil rights at issue." *Id.*

Accordingly, a district court "must consider the excellence of the overall result, not merely the amount of damages won[,]" in determining whether and by how much to reduce a prevailing plaintiff's fee award. *Id.; see also Morales,* 96 F.3d at 365, 365 n. 12 (assessment of "results obtained" by a civil rights plaintiff "should not be limited to the damages that

person received" and "district court should consider not only the monetary results but also the significant nonmonetary results [that a plaintiff] achieved for himself and other members of society"). Specifically, in determining a reasonable fee award, a court should consider whether and to what extent a plaintiff's lawsuit has benefited the public. *Rivera,* 477 U.S. at 574, 106 S.Ct. 2686 (rejecting notion that a civil rights action for damages is nothing more than a private tort suit benefiting individual plaintiffs and noting that "a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards"); *McCown,* 565 F.3d at 1105. Where a lawsuit has effected a change in policy or served as a deterrent to widespread civil rights violations, it may justify a fully compensatory fee award despite a plaintiff's otherwise limited success. *McCown,* 565 F.3d at 1105.

Plaintiffs achieved an "excellent result" in this litigation notwithstanding their limited success. First, Plaintiffs effected a meaningful change in policy to the extent the Court declared the amplified sound ban unconstitutional. Because Plaintiffs prevailed on this claim, the City is no longer free to enforce or revert back to an amplified sound ban that uniquely burdens performers and artists. Going forward, Plaintiffs, similarly situated street performers and the public at large will reap the benefits of Plaintiffs' victory.

Second, Plaintiffs' successful as-applied challenge to the Rules of Decorum also achieved an important public purpose. As the Court noted in its MSJ Order, Defendant unconstitutionally punished "political speech at the heart of the First Amendment" by ejecting and suspending Plaintiffs Dowd and Saltsburg from City Council meetings absent an actual disruption. (Dkt. No. 287 at 39, 42). By silencing its critics, the City not only injured Plaintiffs in the exercise of their constitutionally protected rights, it also "injured[d] itself as much ..., for the gadfly's task is to stir into life the massive beast of the city, to 'rouse each and every one of you, to persuade and reproach you all day long.'" *(Id.* at 42 (quoting Plato, *Five Dialogues, Hackett,* 2d Ed., Trans. G.M.A. Grube, 35 (Apology))). As a result of this litigation, the City will likely reevaluate how it conducts City Council meetings, in turn making it less likely that individuals partaking in public comment sessions will be wrongfully removed and suspended from meetings for engaging in protected political speech.

The cases that Defendant cites do not favor of reducing Plaintiffs attorney's fees under the second prong of *Hensley.* In *McGinnis v. Kentucky Fried Chicken of Cal.,* 51 F.3d 805 (9th Cir.1994), the plaintiff sued his employer under a Washington statute prohibiting disability discrimination and on two common law theories, intentional and negligent infliction of emotional distress, after he was terminated from his job while undergoing cancer treatment. *Id.* at 807. Although the plaintiff obtained $234,000 in damages at trial, the Ninth Circuit later reduced this award to $34,000 on the ground that the Washington statute giving rise to the plaintiff's successful claim did not entitle the plaintiff to punitive damages. *Id.* at 808. Prior to the Ninth Circuit's reduction of the plaintiff's damages, the District Judge ruled that even if the plaintiff was not entitled to $200,000 in punitive damages, he would nevertheless award the plaintiff the same attorney's fees—$148,238.97. *Id.* at 809. The Ninth Circuit held that the district court's manifest unwillingness to adjust the fees downward was an abuse of discretion because courts must consider a plaintiff's extent of success in awarding fees. *Id.* at 810. The Ninth Circuit explained

that "[w]here the relief sought and obtained is limited to money, the terms 'extent of success' and 'level of success' are euphemistic ways of referring to money." *Id.* Thus, when the *McGinnis* plaintiff's damages dropped from $234,000 to $34,000, his "extent of success" plummeted, and the district court was obligated to take note of this change when making its fee determination. *See id.*

Here, the Court recognizes the sizable discrepancy between the damages Plaintiffs sought at trial and the nominal damages they obtained. However, unlike *McGinnis,* the instant litigation is a civil rights action brought pursuant to § 1983. Whereas the plaintiff in *McGinnis* sued a private party for workplace discrimination pursuant to a state statute, Plaintiffs in this case successfully sued a state actor for violations of their First Amendment rights. The Supreme Court has expressly rejected the idea that § 1983 actions are simply private tort suits benefiting only the individual plaintiffs whose rights were violated. *Rivera,* 477 U.S. at 574, 106 S.Ct. 2686. Unlike most private tort litigants, like the litigant in *McGinnis,* "a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *Id.* The Ninth Circuit has therefore made clear that in undertaking step two of the *Hensley* inquiry, a court should not narrowly train its focus on the monetary results a plaintiff obtains, but instead consider the significant nonmonetary benefit a plaintiff's lawsuit confers on the public at large. *See, e.g., McCown,* 565 F.3d at 1103–05; *Morales,* 96 F.3d at 364–65.

Plaintiffs here won nominal damages after seeking considerably more and obtained only partial success on the merits. However, in successfully challenging the amplified sound ban and the application of the Rules of Decorum against Plaintiffs' Dowd and Saltsburg, Plaintiffs vindicated their own rights and "secure[d] important social benefits that are not reflected" in their damages award. *See Rivera,* 477 U.S. at 574, 106 S.Ct. 2686. Even partial success here represents a significant result. As noted by the Ninth Circuit, "Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief[,]" *id.* at 575, 106 S.Ct. 2686, and Defendant cannot justify a further reduction in Plaintiffs' fees by reference to Plaintiffs' nominal damages award, especially in light of the substantial reduction in fees that this Court has already approved.[19]

Defendant also cites to *Farrar* for the proposition that a district court determining a fee award must give primary consideration to the amount of damages sought versus the amount of damages obtained. (Dkt. No. 417 at 22–23). However, as Justice O'Connor noted in her concurrence, the technical nature of the plaintiff's victory in *Farrar* was "readily apparent[.]" 506 U.S. at 120, 113 S.Ct. 566 (O'Connor, J., concurring). Despite seeking $17 million in damages, the *Farrar* plaintiff obtained "one dollar from the least culpable defendant and nothing from the rest[.]" *Id.* at 121, 113 S.Ct. 566. Thus, although the plaintiff "may have won a point ..., the game, set and match all went to the defendants." *Id.* Notwithstanding the obviously "Pyrrhic" nature of the plaintiff's

---

**19.** The Court further notes that *McGinnis* expressly disapproved of the pro rata reduction in fees that Defendant proposes. Defendant asks the Court to reduce Plaintiffs' fee award by 88% because Plaintiffs allegedly succeeded on only 12% of their claims. However, the Ninth Circuit noted that such an approach "makes no practical sense." *McGinnis,* 51 F.3d at 808.

victory, Justice O'Connor still allowed for the possibility of fees had the lawsuit "accomplished some public goal other than occupying the time and energy of counsel, court, and client." *Id.* at 121–22, 113 S.Ct. 566. Indeed, Justice O'Connor made clear that "[t]he difference between the amount recovered and the damages sought is not the only consideration[,]" and "[n]ominal relief does not necessarily a nominal victory make." *Id.* at 121, 113 S.Ct. 566.

In sharp contrast to the *Farrar* plaintiff, Plaintiffs sued one defendant and, despite receiving only nominal damages, secured a meaningful public benefit involving free speech rights "occup[ying] the highest rung of the hierarchy of First Amendment values[.]" *Snyder,* 562 U.S. ——, 131 S.Ct. at 1215. Far from hollow or technical, Plaintiffs' victory in this action sparked a policy change and generated meaningful benefits inuring to the public— put simply, their victory had teeth. Therefore, despite Defendant's suggestion to the contrary, *Farrar* lends weight to the award of fees in this case.

Finally, Defendant drew the Court's attention to *Hoye v. City of Oakland ("Hoye I"),* 653 F.3d 835 (9th Cir.2011), and *Hoye v. City of Oakland ("Hoye II"),* 2012 WL 4644307 (N.D.Cal. Oct. 1, 2012), during the May 5, 2014 hearing on the motions. In *Hoye I,* the Ninth Circuit upheld the lower court's dismissal of the plaintiff's facial challenge to the City of Oakland's "bubble ordinance," which prohibited knowingly and willfully approaching within eight feet of an individual seeking entry to an abortion clinic if one's purpose in approaching that person was to engage in conversation, protest, counseling, or various other forms of speech. *See Hoye I,* 653 F.3d at 839, 859. However, the Ninth Circuit, reversing the district court's decision, granted the plaintiff's as-applied challenge to the ordinance, reasoning that the city's en-

forcement policy was an invalid, content-based regulation of speech to the extent the ordinance was *not* enforced against those who approached individuals in order to facilitate or encourage access to abortion clinics. *See id.* at 849–857. The court of appeals then remanded the case to the district court with orders to enter declaratory judgment in favor of the plaintiff on his as-applied challenge and to determine if injunctive relief was appropriate. *See id.* at 856–57.

After the district court entered judgment, the plaintiff moved for attorney's fees. *See Hoye II,* 2012 WL 4644307, at *2. The district court granted the plaintiff's fee petition, but awarded substantially lower fees than the plaintiff requested on the ground that his success was limited in comparison to the scope of the litigation as a whole. At step one of the *Hensley* inquiry, the district court noted that the plaintiff's facial and as-applied challenges to the ordinance were unrelated. *See id.* at *5. The court explained that "[t]he facts involved in the as-applied challenge were the [p]laintiff's 'counseling' activities outside of the clinics, the actions of the escorts, and the responses of the Oakland Police Department. The only facts involved in the facial challenge were the words of the [o]rdinance." *Id.* The court also noted that the legal theories involved in each challenge were distinct because the plaintiff's efforts on the unsuccessful claim did not contribute to his victory on the as-applied challenge. *Id.* However, because the court could not "excise from [the] [p]laintiff's fee request the hours worked on unsuccessful claims[,]" it turned to the "limited success" prong of *Hensley* to reduce the plaintiff's fee award. *Id.*

At step two of the *Hensley* inquiry, the district court focused on the significance of the overall relief that the plaintiff obtained and awarded him half the attorney's fees

billed through oral argument in the Ninth Circuit, "a time period in which [p]laintiff pursued both his facial and as-applied challenges." *Id.* at *6–7. Although the plaintiff obtained a significant result with respect to the city's enforcement of the ordinance, the district court concluded that the litigation was about more than "even-handed enforcement [of the ordinance.]" *Id.* at *6. "[I]t was also very much about [the] [p]laintiff's desire to have the Ordinance in its entirety declared unconstitutional and, indeed, unenforceable." *Id.* In other words, the plaintiff achieved even-handed enforcement, but, in fact, wanted much more, *i.e.*, the invalidation of the eight-foot bubble altogether. *Id.*

Given the parallels between the *Hoye* cases and the instant litigation, Defendant argues that *Hoye II* militates strongly in favor of reducing Plaintiffs' fee award. However, the Court finds that *Hoye II* is inapposite and does not compel a departure from the lodestar amount.

█ First, "[a] decision of a federal district judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene,* ⸺ U.S. ⸺, 131 S.Ct. 2020, 2033 n. 7, 179 L.Ed.2d 1118 (2011) (internal quotation marks omitted). Therefore, notwithstanding this Court's respect for its colleague in the Northern District of California, neither the outcome nor reasoning in *Hoye* controls in this case.

Second, the Court disagrees with Defendant's suggestion that, pursuant to *Hoye II,* Plaintiffs' facial and as-applied challenges to the Rules of Decorum are unrelated. The *Hoye II* court did not cite any case law for the proposition that the plaintiff's facial and as-applied challenges were not related, and other courts addressing this issue have reached a different result. *See, e.g. McDonald v. Bowen,* 693 F.Supp.

1298, 1305 (D.Mass.1988) (successful as-applied challenge "raised largely the same issues" as unsuccessful facial attack of same regulations because the "two different theories were clearly advanced to remedy the same injury, and in fact the plaintiffs essentially succeeded in winning the relief they had sought"); *ATL, Inc. v. City of Seattle,* 2012 WL 1949044, at *4 (W.D.Wash. May 29, 2012) (facial and as-applied challenges arose from common core of facts); *Frost v. Town of Hampton,* 2010 WL 1667290, at *2, 6 (D.N.H. April 23, 2010) (street preachers' as-applied and facial challenges to statute prohibiting "loud or unreasonable noises in a public place" were "closely related, both legally and factually"). Moreover, the Court's analysis in the MSJ Order strongly suggested that Plaintiffs' facial and as-applied challenges to the Rules of Decorum both turned on the same legal issue, namely whether the Rules of Decorum required an "actual disruption" before an individual could be removed from a City Council meeting. (*See* Dkt. No. 287 at 29–42). Although the Court's analysis of Plaintiffs' as-applied challenge was more fact-intensive than its discussion of their facial challenge, there is no question that the Court's analysis regarding the Rules' facial constitutionality informed and animated its decision on Plaintiffs' as-applied challenge.

While the *Hoye I/II* plaintiff's facial and as-applied claims may have been factually and legally distinct, Plaintiffs' claims are not. Indeed, Defendant did not challenge the relatedness of Plaintiffs' claims until the May 5, 2014 hearing on the motions. *See Barnes v. AT & T Pension Benefit Plan–Nonbargained Program,* 963 F.Supp.2d 950, 969 (N.D.Cal.2013) (acknowledging *Hoye II* and noting that where a defendant does not challenge the relatedness of the plaintiff's claims, a court need only consider the second prong of

*Hensley* ). In *Hoye II*, the district court's finding at *Hensley's* first step drove its decision to reduce the plaintiff's award at step two. *See Hoye II*, 2012 WL 4644307, at *5. Because Plaintiffs' successful and unsuccessful claims in this case are related, this Court is not similarly motivated to reduce Plaintiffs' fee award.

Third, the *Hoye I/II* plaintiff succeeded only on an as-applied challenge. After the Ninth Circuit's ruling, the City of Oakland was still free to enforce the bubble ordinance, so long as it did so "in a manner consistent with the protocols [set forth] in [ ] revised training materials." *Id.* at *1. By contrast, Plaintiffs succeeded not only on their as-applied challenge to the Rules of Decorum, but also on their facial challenge to the 2008 amplified sound ban. As a result of this litigation, the amplified sound ban is no longer in effect and the City may only restrict amplified sound if it enacts a more narrowly tailored sound ban. Because Plaintiffs achieved a type of success that simply was not present in *Hoye I/II*, *Hoye II* has limited persuasive value here.

Fourth, the *Hoye II* court reduced the plaintiff's fee award due, in large, to the plaintiff's avowed objective of invalidating the bubble ordinance altogether. *Id.* at *6 (explaining that the plaintiff's relief was "significantly narrower" than he sought because the case was "very much about [his] desire to have the [o]rdinance in its entirety declared unconstitutional and, indeed, unenforceable"). By contrast, Plaintiffs achieved their desired goal with respect to the amplified sound ban because it was held facially unconstitutional. Defendant argues that the City is free to enact a comparable, but evenhanded amplified sound ban that would undo Plaintiffs' success in this case; however, as of the date of this Order, the City has not enacted any

such ordinance, and Plaintiffs continue to enjoy the fruits of their victory.

With respect to the Rules of Decorum, there is no indication that Plaintiffs' main objective was to create a City Council free from all rules of decorum. Unlike the *Hoye I/II* plaintiff, who sought to pop the bubble ordinance entirely because it was " 'virtually impossible to start up a conversation with someone from eight feet away[,]' " *id.* (quoting the plaintiff), Plaintiffs challenged the Rules of Decorum, facially and as-applied, only to the extent the Rules allowed the City to punish speakers absent an actual disruption to City Council meetings. Plaintiffs did not initiate this lawsuit because they found it "virtually impossible" to partake in City Council meetings due to the Rules generally; rather, they sued to rectify the City's use of the Rules to punish political speech.

Plaintiffs' as-applied challenge to the Rules of Decorum ultimately vindicated their rights and provided the City with valuable guidance regarding the Rules' enforcement. Thus, Plaintiffs achieved their objectives in a way that the *Hoye I/II* plaintiff did not. The *Hoye I/II* plaintiff's success was narrow—he ensured the bubble ordinance's enforcement against individuals unlike him, *i.e.*, those seeking to facilitate access to abortion clinics. By contrast, Plaintiffs succeeded in reducing the likelihood that *they* and *others like them* would be unconstitutionally silenced at City Council meetings.

For the foregoing reasons, the Court finds that Plaintiffs achieved "excellent results" in this litigation. Accordingly, the Court will not reduce Plaintiffs' fee award "simply because the district court did not adopt each contention [they] raised." *Hensley*, 461 U.S. at 440, 103 S.Ct. 1933. The Court therefore awards Plaintiffs **$601,902.50** in attorney's fees.

### D. *Plaintiffs Are Entitled To Their Costs Incurred Prior To December 17, 2013*

Pursuant to § 1988, a prevailing § 1983 plaintiff may recover reasonable out-of-pocket expenses that would normally be charged to a fee paying client. *See Woods v. Carey,* 722 F.3d 1177, 1179 n. 1 (9th Cir.2013) (citing *Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir.1994)). The Court has reviewed Plaintiffs' bills, (*see* Dkt. No. 390–1 at 29–30), and finds that Plaintiffs incurred $2,485.76 in recoverable costs prior to December 17, 2013, such as parking fees, messenger fees, copying charges, transcript fees, shipping costs and Westlaw legal research costs. *See Harris,* 24 F.3d at 19 (approving similar costs). Plaintiffs are also entitled to recover $350 for the cost of initially filing this lawsuit in this Court. (*See* Dkt. No. 390 at 18).

Plaintiffs seek $623.37 for a VGA adapter used to present graphics at trial. Plaintiffs are barred from recovering costs postdating December 17, 2013, and the Court finds that Plaintiffs are not entitled to recoup the cost of an item that was purchased for the express purpose of being used after Plaintiffs rejected Defendant's Rule 68 offer.

Plaintiffs also seek $19,936 for the services of Lin Yip, a trial graphics consultant. However, as discussed above, a party may not recover costs for trial technician services. Moreover, Plaintiffs have not presented the Court with any bills detailing when Ms. Yip provided Plaintiffs her services. The earliest that Ms. Yip is mentioned in Plaintiffs' bills is December 23, 2013, (*see id.* at 61), six days after Plaintiffs rejected Defendant's offer of judgment. Although Plaintiffs' bills indicate that Mr. Rohde met with a trial graphics consultant on December 17, 2013, (*see id.* at 29), it is not clear whether the consultant in question was Ms. Yip or, if it was Ms. Yip, whether she charged Plaintiffs for this work. Accordingly, Plaintiffs are not entitled to recover any costs incurred as a result of their engagement of Ms. Yip's services. Plaintiffs are therefore entitled to recover **$2,835.76** in costs.

## IV.

## CONCLUSION

For the foregoing reasons, the Court (1) GRANTS Plaintiffs' Motion for Attorneys' Fees and Costs and awards Plaintiffs **$601,902.50** in attorney's fees and **$2,835.76** in additional costs, and (2) GRANTS Defendant's Motion for Costs and awards Defendant **$13,384.93** in costs.